Eric L.Gonzalez-E66196
P.O.Box 689 XW222 Low
CTF-Central Yard
Soledad, CA 93960-0689

FILED

OCT 02 2025

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GONZALEZ,

       Plaintiff,

   v.

TUMACDER, et al.,

       Defendants.

_____ /

Case No.3:24-cv-06675-RFL

DECLARATION OF ERIC GONZALEZ
IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

Judge: The Honorable Rita F. Lin
Trial Date: Not Set
Action Filed: September 24, 2024

I, Eric Gonzalez, declare:

1. I am a inmate housed at the Correctional Training Facility ("CTF") in Soledad, California. I have been incarcerated for 28 years. I am competent to testify to the matters set forth in this declaration and, if called upon by this Court, I could and would do so.

2. On January 9, 2024, I was given a Post-Board Unit Classification Committee hearing that was headed by Defendant Tumacder, following a parole denial by the Board of Parole Hearings ("Board").

3. During the January 2024 hearing with Defendant Tumacder, I had requested to participate in the Family Visiting Program so that I could privately pray with my family and other Christian approved visitors. Defendant Tumacder("Tumacder") stated that I was ineligible to participate in the Family Visiting Program. I responded by stating

1

to Tumacder that I felt he was violating my religious rights. Tumacder responded back to me by stating I can take it up on appeal.

4. I am of the Christian faith. My belief in private prayer with my family and other Christians is based, in part, on the Bible verses in Acts 2:1, 4.

5. My two brothers (Bobby Gonzalez, Larry Chambers) are of the Christian faith, and my fiancee (Deanna Palmer) is of the Christian faith.

6. In 1994, the California Department of Corrections and Rehabilitation ("CDCR") approved me to participate in the Family Visiting Program.

7. On January 9, 2024, I was given a Post-Board Unit Classification Committee hearing that was headed by Tumacder, following a Board parole denial.

8. During the January hearing with Tumacder, I requested to be considered for custody reduction in accord with the Board's recommendations that I do so. Without accepting any of my documents that supported lowering my custody level, Tumacder stated that I was ineligible for custody reduction consideration and that I could appeal it.

9. In 1993, 1994, 1995, and 1996, I was housed at a Level One facility ("CCI") in Tehachapi, California. While housed at CCI, CDCR did not place a VIO determinate on my custody level and I maintained a custody score of 18 points or less, even though CDCR classified me with an "R" Suffix determinate.

10. When I was housed at CCI, I would see other sex offenders

2

participate in the Family Visiting Program.

11. The Family Visiting housing units are positioned under a gun tower within the security perimeter of the facility where I am housed at CTF. There are no Family Visiting housing units outside of CTF's secured perimeter electric fence.

12. There are 12 Family Visiting housing units where I am housed that allows quick family visiting rotation.

13. CDCR's Family Visiting Program is the only way that would allow me to privately pray with my family and other Christians who are approved for visiting.

14. During the January 2024 hearing with Tumacder, Tumacder did not discuss with me whether there were other alternatives that would allow me to pray privately with my family and other Christians.

15. When I was housed at the North Facility yard at CTF in the beginning of 2003, my former cell mate assaulted me because he saw the VIO/sex offender determinate on my prison documents. Having the VIO/sex offender determinate has caused me to live in constant fear of being assaulted again by other inmates and has caused me to experience panic attack, migraines, depression, and insomnia over the years.

16. When my January 2024 hearing with Tumacder had concluded, I experienced migraines for fear of being assaulted again due to me having classification documents identifying me with VIO/sex offender determinates.

17. Security Threat Group-1 inmates are allowed to participate in the Family Visiting Program as long as they meet the

criteria in title 15 §§3177(b)(1), 3177(b)(2)(A)-(H) of the California Code of Regulations.

18. Security Threat Group-2 inmates are allowed to participate in the Family Visiting Program as long as they meet the criteria in title 15 §§ 3177(b)(1), 3177(b)(2)(A)-(H) of the California Code of Regulations.

19. Security Threat Group inmates are allowed to participate in the Family Visiting Program as long as they meet the criteria in title 15 §§ 3177(b)(1), 3177(b)(2)(A)-(H) of the California Code of Regulations.

20. A true and correct copy of Plaintiff Gonzalez ("Gonzalez") Abstract of Judgment is attached as Exhibit A.

21. A true and correct copy of the relevant portions of the transcript of Gonzalez's deposition taken on June 5, 2025 is attached as Exhibit B.

22. A true and correct copy of the Board Panel's recommendation that Gonzalez lower his custody level is attached as Exhibit D.

23. On April 15, 2025, Tumacder gave responses to Gonzalez's interrogatory request. A true and correct copy of the relevant portions of Tumacder's response to Gonzalez's interrogatory request is attached as Exhibit C.

24. A true and correct copy of Gonzalez's CDCR Reclassification Score Sheets from the years of 1993, 1994, and 1995 is attached as Exhibit E.

25. A true and correct copy of the July 18, 1994 CDC 128-B chrono having approved Gonzalez for family visiting is attached

4

as Exhibit F.

26. On May 7, 2025, an approved Comprehensive Risk Assessment ("CRA") from the Board of Parole Hearings' Forensic Psychology Division, on Gonzalez, was completed. A true and correct copy of the relevant portions of the CRA is attached as Exhibit G.

27. A true and correct copy of title 15 sections 3000 at p.20, 3115(g)(5)(H), 3170(b), 3377, 3375, 3375.2(b)(28) of the California Code of Regulations is attached as Exhibit H.

28. A true and correct copy of CDCR 128-B chronos of Correctional Officers A.Gonzalez, Morris, D.Sisneros, Correctional Sergeant T.T. Lamson, Correctional Supervising Cooks G.Campbell, S.Adams is attached as Exhibit I.

29. On January 9, 2009, CDCR official Dr.Hutchinson(Psychologist) examined Gonzalez as a result of Gonzalez being assaulted by his then cell mate who had discovered Gonzalez's prison documents that revealed his VIO/sex offender determinates. A true and correct copy of Dr.Hutchinson's findings from the January 2009 examine of Gonzalez is attached as Exhibit J.

I declare under penalty of perjury that I have read this document, and its contents are true and correct to the best of my knowledge.

Executed on the 24th of September, 2025, in Soledad, California.

Eric Gonzalez

EXHIBIT

OKD TO GO B/W NOTED

MAR 0 6 1998

CDC# E66196

# ABSTRACT OF JUDGMENT - PRISON COMMITMENT
## INDETERMINATE SENTENCE

FORM CR 292

☒ SUPERIOR
☐ MUNICIPAL
☐ JUSTICE

COURT OF CALIFORNIA, COUNTY OF **LOS ANGELES**

BRANCH OR JUDICIAL DISTRICT: **CENTRAL CRIMINAL**

COURT (I.D.) **1 9 0 0 0 1**

**ORIGINAL FILED**

**MAR 0 5 1998**

**LOS ANGELES SUPERIOR COURT**

PEOPLE OF THE STATE OF CALIFORNIA versus
DEFENDANT: **GONZALEZ, ERIC LAMONT**
AKA: **BKG # 5304488**

☒☒ PRESENT
☐ NOT PRESENT

BA152981 - A
- B
- C
- B
- B

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT
AMENDED
ABSTRACT ☐

| DATE OF HEARING AND JUDGMENT | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 02-18-98 | 119 | JAMES DUNN | T BLAYLOCK |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| D DRISCOLL | C VAZQUEZ | D THORR | X307639 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:

☐ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES)

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | MO | DAY | YEAR | JURY TRIAL | COURT TRIAL | PLEA | CONCURRENT | CONSECUTIVE | 654 STAY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | PC | 664/207(A) | ATTEMPTED KIDNAPPING | 97 | 12 | 09 | 97 | X | | | | | |
| 4 | PC | 220 | ASSAULT W/ INTENT COMMIT FELONY | 97 | 12 | 09 | 97 | X | | | | | X |

2. ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.: For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add up time for enhancements on each line and enter line total in right-hand column.

| Count | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 12022(B)(1) | 1 | | | | | | | | | 1 |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRISON PRISON TERMS (mainly § 667-series) and OTHER: List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 non-violent prior prison terms under § 667.5(b), list § 667.5(b) 2 times). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter here any other enhancement not provided for in space 2.

| Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Enhancement | Yrs. or "S" | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 667(A)(1) | 5 | | | | | | | | | 5 |

4. Defendant was sentenced to State Prison for an indeterminate term:
   A. ☐ For LIFE WITHOUT THE POSSIBILITY OF PAROLE on counts _____
   B. ☐ For LIFE WITH POSSIBILITY OF PAROLE on counts _____
   C. ☐ For 15 years to life, WITH POSSIBILITY OF PAROLE on counts _____
   D. ☒☒ For 25 years to life, WITH POSSIBILITY OF PAROLE on counts ___3___
   E. ☐ For other term prescribed by law on counts _____ (Specify term on separate sheet if necessary.)
   PLUS enhancement time shown above.

5. ☐ Indeterminate sentence shown on this abstract to be served ☐ consecutive to ☐ concurrent with any prior incompleted sentence(s)

6. Other Orders: (List all consecutive/concurrent sentence relationships, fines, etc. if not shown above)

   1202.45 $5000,00 - suspended - see Remittitur

(Use an additional page if necessary.)

7. ☒☒ The Court advised the defendant of all appeal rights in accordance with rule 470, California Rules of Court. (AFTER TRIAL ONLY)

8. EXECUTION OF SENTENCE IMPOSED:
   A. ☒☒ AT INITIAL SENTENCING HEARING
   B. ☐ AT RESENTENCING PURSUANT TO DECISION ON APPEAL
   C. ☐ AFTER REVOCATION OF PROBATION
   D. ☐ AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d))
   E. ☐ OTHER _____

9. DATE OF SENTENCE PRONOUNCED (MO, DAY, YR) **02-18-98**

| CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS 261 INCLUDING | ACTUAL LOCAL TIME 227 | LOCAL CONDUCT CREDITS 34 | STATE INSTITUTIONS ☐ DMH ☐ CDC |
|---|---|---|---|---|

10. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:
    ☒☒ FORTHWITH
    ☐ AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS
    INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:
    ☐ CALIF. INSTITUTION FOR WOMEN—FRONTERA
    ☐ WASCO
    ☐ OTHER (SPECIFY) _____
    ☐ CCWF—CHOWCHILLA
    ☐ SAN QUENTIN
    ☒ CALIF. INSTITUTIONS FOR MEN—CHINO
    ☐ R.J. DONAVAN
    ☐ DEUEL VOC INST.

## CLERK OF THE COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| P PASCUAL | 03-05-98 |

This form is prescribed under Penal Code § 1213.5 to satisfy the requirements of § 1213 for indeterminate sentences. Attachments may be used but must each be referred to in this document.

Form Approved by the Judicial Council of California Effective January 1, 1999

**ABSTRACT OF JUDGMENT – PRISON COMMITMENT – INDETERMINATE**
CR 292

Pen. C. § 1213

DISTRIBUTION    PINK COPY—COURT FILE    YELLOW COPY—DEPARTMENT OF CORRECTIONS    WHITE COPY—ADMINISTRATIVE OFFICE OF THE COURTS

EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

GONZALEZ,                          )
                                   )
              Plaintiff,           )
                                   ) Case No.:3:24-cv-06675-RFL
                                   )
vs.                                )
                                   )
TUMACDER, et al.,                  )
                                   )
              Defendants.          ) (Pages 1-62)
                                   )

VIDEOCONFERENCE DEPOSITION OF

ERIC GONZALEZ

Thursday, June 5, 2025

11:28 a.m. PDT

Reported by: John Fahrenwald,  CA CSR 14369, RPR

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800 367 3376)

Page 6

Q. Are you represented by counsel in this matter?

A. No.

Q. Have you ever used any other names?

A. No.

Q. Have you ever gone by any nicknames?

A. Gonzo for -- short for Gonzalez.

Q. Any other nicknames?

A. No.

Q. Have you ever testified in a legal proceeding?

A. Yes.

Q. When?

A. Trial, my current offense, my trial.

Q. Just to clarify, was it your criminal trial?

A. My criminal trial, yes.

Q. Do you recall when that was?

A. 1997.

Q. And have you had your deposition taken before?

A. No.

Q. So I'm just going to go over some ground rule for all of us to follow to make sure that today's deposition goes as smoothly as possible for all of us. First, if you get tired at any time during this deposition and you want to take a break, just let me know and we can take a break at any time. I just ask that if there's a question pending, so if I asked you the question, please answer the question and

Page 7

then we can take a break.

Does that make sense?

A. Sure.

Q. Throughout this deposition, the court reporter will be recording my questions and your testimony. The court reporter cannot record gestures or nods of the head, shakes of the head. So it's important that when I ask a question that you verbally answer it. I know it's a little bit unnatural to speak or to have a conversation without using gestures or nods of the head or anything like that, but we both need to remember to do that so the record can be complete and to make it easy for Mr. Fahrenwald.

Does that make sense?

A. Yes.

Q. The court reporter also needs to clearly hear every statement so we can't speak over each other during this deposition. I'm going to make every effort to not talk over you and I would ask that you do the same.

Does that make sense?

A. Yes, of course.

Q. So you've just been placed under oath just like in court, so the same rules that apply to perjury apply to here.

Does that make sense?

A. Yes.

Page 8

Q. During this deposition, it's important that you understand each question that I ask so that your answer is responsive to that question. I may ask questions that maybe I don't state very well or I don't phrase very well, so if I ask a question and you don't understand the question for any reason, don't answer it, just let me know that you don't understand, and I will rephrase the question, or try to ask a different one, or try to ask it in a different way. If I ask a question and you answer it, I'm going to assume that you understood it.

Does that make sense?

A. Yes.

Q. And throughout this deposition, I am entitled to your best estimate. I don't want you to guess, though. So if, for example, I asked you to estimate the length of the table that is in front of you, you would be able to do that because you're looking at it right now. If I asked you to estimate the length of the table in my office, you wouldn't be able to do that because you haven't seen it. So that would be a guess.

Does the distinction between an estimate and a guess make sense?

A. It does. I may object, but it does.

Q. Okay. And along similar lines, if I ask you a question and you just don't know the answer, just say that

Page 9

you don't know. I'd rather have you say that than a guess.

A. Okay.

Q. Is there any reason health or otherwise that you can't give me your best testimony today?

A. No.

Q. So I'm going to ask you a few questions about your background before we get into discussing this case.

First, can you confirm your date of birth?

A. 5/4/70.

Q. Where were you born?

A. Atlantic City General Hospital in New Jersey.

Q. When did you -- what was the start date of your current incarceration in state prison?

A. In state prison, I want to say March, 1998.

Q. And what was your commitment offense?

A. Attempted kidnap.

Q. Have you served any other sentences in state prison?

A. Yes. I served my first term in 1990.

Q. 1990?

A. Yes.

Q. And when did that end?

A. 1996.

Q. And any other sentences in state prison?

A. No.

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Page 14

Q. Did you review any documents, read anything, anything you did to prepare?

A. No.

Q. Did you speak with anyone about your deposition today?

A. A couple guys, yeah.

Q. Who?

A. Just random people that had a -- did -- had experience with a deposition before. Just to see what to expect. But nobody in particular.

Q. Are the people you spoke to also incarcerated?

A. Yes.

Q. Do you recall any of their names?

A. Man, not really. They got nicknames, but it's more like in passing. It wasn't anything of any extensive conversation, just have you ever had one, yeah, I've had one. Some guy said no, they haven't had any. So it wasn't really any extensive conversation about it.

Q. Approximately how many people did you speak to about your deposition today?

A. I don't know.

Q. And other than what you just said, do you recall what you discussed with them?

A. Just the length of it, am I allowed to take breaks, the length, am I allowed to take breaks, what can I

Page 15

bring to the deposition, and that was basically about it.

Q. And do you recall any of their nicknames?

A. Hmm. Rico, that's one person I talked to about it, but he never had a deposition, though. The rest of them, I don't know.

Q. Okay. Have you spoken with anyone about this lawsuit in general?

A. Yeah.

Q. Who?

A. A few people. But to be honest, I can't really recall all their names because I got a thousand people here. We talk to people at random. So things come up, pass the time, talk about a situation and move on. So I can't really say, oh, I talked to this guy and he gave me this in depth insight about something. It's not those type of conversation. It's more just to pass the time while we're sitting at chow or breakfast or dinner just to pass the time.

Q. Do you recall the names of anyone you spoke to about this lawsuit?

A. The one guy Rico, because I see him more frequently than anybody. But other than that, that's about it.

Q. And would you say you spoke to more than five people in general about this lawsuit?

Page 16

A. Yeah.

Q. More than ten?

A. I don't know about ten, but more than five.

Q. And do you recall what you discussed with anyone you spoke to?

A. Everything.

Q. Do you recall more specifically?

A. The reason why I say everything is because the classification hearing is rather short. It wasn't a prolonged classification hearing, that they never are, but it was probably five or 10 minutes, that was it.

Q. And what particularly did you discuss with the others about that?

A. Just what happened, try to go in there and try to get a family visit consideration, and lower my custody level consideration, and it didn't go well.

Q. Do you recall anything else that you spoke to with other individuals about this lawsuit or the subject of this lawsuit?

A. No.

Q. Did you exchange any letters or documents with anyone regarding today's deposition?

A. This deposition?

Q. Mm-hmm.

A. No.

Page 17

Q. Okay. And has anyone assisted you with filing or litigating this lawsuit?

A. No.

Q. Did you bring any documents with you today?

A. I brought a pad here. I brought the complaint here. And that's it.

Q. Okay. The operative complaint in this case was filed on September 25th, 2024.

Is that your understanding as well?

A. Say that date again, please.

Q. September 25th, 2024?

A. September. That's when it was filed, but I think it was done again in -- mine says September 9th.

Q. Give me a minute. Let me see, look through the record.

A. Let me rephrase it. That's the day that I mailed it from here.

Q. Okay.

A. So it may be the 25th with the Court, but the day I mailed it from here.

Q. That's the -- yeah, that's the date I'm looking at, just give me one second and let me go through the record to make sure our understanding matches.

Did you say you mailed it on September 9th?

A. That's what I have down here on my -- on my

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Page 22

to practice your religion?

A. Respect women. Don't lie. Be honest. I fast. I do what it's called private fasting as well, where you don't let nobody know you're fasting. What else? I pray. I pray openly, I pray privately, I worship with other believers as required. Pray over my food, give thanks, pray in tongues, pray in the spirit. That's another tenet. So those are some of the few things that I do that's required.

Q. Would you say you practice your religion on a daily basis?

A. Yes.

Q. And other than what you just listed, are there other things you do on a regular basis to practice your religion?

A. Yeah. I -- practicing my religion is like a lifestyle. It's not like a -- like a one size fit all. It's a lifestyle. It's how you interact with other people, how you interact when you're not around other people. My communication with God through prayer, through reading scriptures Bible reading, Bible studying. So it's not one set thing that you do, it's a lifestyle. It's a 24-hour therein.

Q. Other than what we talked about, are there other ways that your religion is important to you or that you practice your religion?

Page 23

A. Yeah. But in here, you're limited. I mean you can only -- you can't do what I want to do as far as practicing my religion, like it tells me to make love when I get married, but I can't do that because of the prison, the blanket policy against sex offenders having family visits, so I can't do that. So there are other things I want to practice in my religion, that I'm required to practice, but I can't. So, you know, I can only do what I can do that the prison allows me to do.

Q. Is there anything else with regards to your religion that you want to talk about that I haven't asked you about? I just want to make sure I understand everything correctly.

A. I probably do. But I'm -- not like I said, I just can't say it off the top of my head as far as every single thing that I'm supposed to do. But the things that I want to do, I can't because of the prison policies and the defendant. So that's about it.

Q. So I'm going to switch gears a little bit. Did you have any sort of a hearing on January 9th, 2024?

A. January 9th, 2024. January 9th. Yeah, that's the hearing in question now. Right?

Q. Yes. So I just wanted to ask you what you recall about that hearing.

Page 24

A. Oh. Oh, yeah. I went into the hearing -- well, prior to the hearing, they give you 72-hour notice. So my counselor called me and gave me the notice and she asked me, did I want to have the hearing in-person or do I want to go absentia. So I told her I want to go in-person because there's things I wanted to address, me participating in the family visiting, and me getting a custody reduction. So she set that up, three days later, I think we went, on the 9th like you said or around that time.

So when I got in there after the -- everybody introduced themselves, I tried to address the family visiting because I told the defendant that I wanted to worship with my family and other people who can possibly be approved. And they told me because I'm a sex offender that I'm not eligible.

And I told them that I felt that that violated my rights to freedom of religion and under the Religious Land Act. And they said, well, you can take it up on appeal. So we went to the next subject that I wanted to talk about, me lowering my custody level, and he told me that I was ineligible because I'm a sex offender, and I told him I felt like that violated my right to due process because I had brought a stack of self-help chronos and, you know, completions and stuff like that that he didn't want to look at, he didn't even take a look at it, and he told me to take

Page 25

it up on appeal and that's what I did. And the meeting was over.

Q. What type of hearing was it?

A. It was what is called a post-board hearing -- classification hearing.

Q. And just so I understand, what does that mean exactly?

A. To my understanding, it covers your programming in prison, it covers your behavior in prison, basically, it covers everything that a regular classification covers, your program.

Q. Are there other types of hearings that you've experienced while in prison?

A. Your annual classification hearing.

Q. And I assume that happens once a year; is that correct?

A. Once a year.

Q. And what happens during that hearing?

A. Same thing, they go over the same thing. Your programming and your behavior.

Q. Do you know the differences between a post-board hearing and an annual hearing?

A. Well, the only difference is -- and I'm not even sure if it's a difference, is that any recommendations by the board, they'll go -- they will go over that. But

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800 367 3376)

Page 30

Q. And what was his role during that hearing?

A. He was leader. To my knowledge, he was leading it, because he's the only one that was talking. I mean, he didn't say much, but he's the only one who actually said anything.

Q. Give me a moment. Let me just look through my notes.

So with regards to family visits, have you had any family visits while serving your current sentence?

A. No.

Q. And I understand that you had previous -- you've served previous terms in prison.

Have you had family visits during any of those terms?

A. I was approved for family visit -- I was approved for family visiting when I was at Tehachapi, but I just never went on any.

Q. Do you recall when that was?

A. 1993, '94, '95.

Q. And what does it mean to be approved for family visits?

A. Means that you are eligible for family visits.

Q. Who decides that?

A. The counselors.

Q. And do you know what they base that decision on?

Page 31

A. They had a memorandum that went out that -- I don't know which -- I got it in my cell, the number, as far as the number of the memorandum is, not the memorandum itself. But a memorandum went out that sex offenders could have family visiting.

So the counselors there went through their files and I got the notification that I was eligible from my counselor.

Q. And the memoranda that you referred to, do you recall what it was titled?

A. Well actually, I requested it in a production of documents from you and you didn't answer that.

Q. I just wanted to get your background information.

So do you recall when it was issued?

A. I don't know. I'm assuming it was like '93 to '94. Because that's when I got the eligibility approval.

Q. And just so that I'm understanding correctly, you have not had any family visits while serving your current term; is that correct?

A. No. I mean, that's correct, yes. Sorry, sorry about that.

Q. No, you're good. Don't worry. I just want to make sure it reads well on the record because sometimes when

Page 32

we talk naturally it looks a bit confusing on the record.

A. Sorry about that.

Q. No, your fine. It happens to all of us, don't worry, and I know it's a little unnatural to talk that way for the purpose of creating a record, so don't worry about it. Let me go through my notes very quickly before I ask you some more questions.

Why do you think that Tumacder violated your right to freely exercise your religion?

A. I have no clue why. I just felt that he was not trying to hear what I was saying. I mean, he didn't even look at none of my paperwork. I had like four years worth a stack of chronos and completion groups and he didn't want to look at. So I have no clue what he was thinking.

Q. You said you brought a stack of papers with you of chronos to that hearing; is that correct?

A. Yeah, yeah.

Q. What kinds of documents were those?

A. Like I had completed what they have here called cognitive behavioral intervention life skills. And for me that was a good accomplishment for myself because it was a seven month course, I learned a lot in it, and I felt that that would show that, you know, my rehabilitation progress. I had domestic violence chrono from prep. I had victim's awareness, victims' impact, I had criminal thinking, all

Page 33

these different chronos that I completed, all the self-help groups that I was going to, and he just didn't want to look at anything. It was like the answer was already no before I got there. So I -- if like -- I'm assuming he felt that, why should I answer any of that when the answer is, I already know. That's just my assumption. I'm not saying he thought that, but . . .

Q. Are you by any chance familiar with California Code of Regulations Title 15, Section 3177?

A. 3177. Refresh my memory.

Q. That refers to family visiting. It's totally fine if not. I just wanted to ask you.

A. Some of it I am, not by heart the contents of it.

Q. That's fine. What do you know about that part?

A. What I've read in it, as long as your -- as long as your crime is not against a family member and as long as your crime is not against a minor, you can have a family visit no matter what your crime is, except if you're a sex offender, regardless of the circumstances in the sex offense, whether you are urinating on the sidewalk or whether you rape somebody, no matter what, you can't get a family visit, no matter what.

Q. Do you -- are you aware of any other information about that portion of Title 15?

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800 367 3376)

Page 38

Q. Okay. And was there a level of review after that?

A. No. The third level is the highest.

Q. Oh. So that was the only level of review. Correct?

A. No, it's two levels. You have the institutional level, and then if you don't like that response, then you go to Sacramento with it, the Sacramento headquarters.

Q. Did you appeal it to that other level?

A. Yes.

Q. And what was the result?

A. They agreed with the defendant.

Q. Did they give a reason?

A. Yes.

Q. Do you recall what that reason was?

A. I don't remember exactly what it was, but it was the same reason that the second level -- I mean the first level gave a reason. Not the first level, but the first stage of the 602 process.

Q. And I just want to make sure I'm understanding your complaint and this case properly.

So just generally, why are you suing Tumacder for your -- for violation of your right to free exercise?

A. The free exercise plan or the due process claim

Page 39

or both?

Q. Let's start with the free exercise of your religious -- of your religion claim.

Why are you suing Tumacder?

A. Well, he wouldn't give me any consideration. He wouldn't let me exercise my religion. He made no efforts to see if there was an alternative, to see if there was another way we can do it. There was just no consideration whatsoever. It was just no. You're ineligible, appeal it.

Q. And you said that he made no effort to see if there was an alternative.

What does that mean?

A. Well, I mean, is there any way that sex offenders could be considered to go to family visiting, do they have any policies available? You know, anything to where I could participate. He didn't make any efforts. It was just no. It wasn't even a conversation, really.

Q. And again, just so that I'm clear and my understanding is good, what do you -- what role does family visiting play in the practice of your religion?

A. It plays a huge role. It gives me an opportunity to bond with my brothers, worship God together, just make that family connection that I can't make with them any other way. I can't worship with them any other way.

Q. Okay.

Page 40

A. And I certainly can't worship with them privately in any other way. Especially when we want to pray in tongues, I can't -- I can't perform that.

Q. And what role does praying in tongues play within your religion?

A. In my religion, praying in tongues is a way where we're talking to God, and it doesn't let the devil get in the way of intercepting that particular type of message. There's a situation in the book of Daniel where Daniel had prayed to God, and 28 days later the angel came to Daniel and hey, I heard you -- God heard you day one, but I was hindered by the prince of Persia and he resisted me for 28 days. So praying in tongues alleviates that situation. It's a direct message to God without the devil getting in any way of that communication. That's what it serves as. And us being able to do that together is a requirement from the book of Acts.

Q. Other than what we've discussed so far, is there anything you want to talk about with regards to your free exercise claim?

A. No, not really.

Q. If we're ready then, I'm going to switch gears and talk about your due process claim; is that okay?

A. Okay, sure.

Q. Why do you think -- or sorry, we can strike

Page 41

that. Let me just rephrase in a clearer way.

Why are you suing Tumacder for denying you due process?

A. Because he didn't want to hear anything I had to say. He said I was ineligible, but yet he didn't want to hear anything, none of my evidence showing that I was not a security concern to the facility, and have my custody level reduced. He didn't want to hear anything. And the whole purpose of me doing rehabilitative programs is to show that I'm not a threat to the institution. So for him not to even give me an opportunity just to even look at my documents, I felt that that was unfair. I felt he didn't give me a chance to be heard. I mean, you don't have to grant it. But at least look at it, pretend you want to look at it. He's just like, no you're ineligible, you're a sex offender, appeal it, so.

Q. So just so that I'm understanding correctly, you requested that lowering of your custody restrictions be considered at that January 9th, 2024 hearing; is that correct?

A. Yes.

Q. What particularly did you request?

A. I requested the VIO to be removed, the VIO was V-I-O, but it's short for violet, and they attach that to you if you have a sex offense, but they also attach that to

TP.One
Court Reporting
Scheduling@TP.One
www.TP.One
800.FOR.DEPO
(800 367 3376)

Page 46

example, they have programs to where you can get out and wear electronic monitoring device and go to -- I forgot the name of that program -- but if you got a VIO, you're not going to that program, so -- at least I don't believe you are.

There are just other different programs that is -- are offered at other facilities at lower level facilities, but you can't -- I can't go there because of the VIO.

Q. Do you recall anything else about the effect of the VIO?

A. Yeah. The VIO also prohibits me from working certain jobs like the canteen. Canteen is on the yard, but I can't work in the canteen because I have a VIO. Even though it's within the facility perimeters, I still can't work in the canteen because I have a VIO.

Q. And other than that, are you aware of any other effects of having a VIO?

A. Not off the top of my head. Just those that I named.

Q. And what is the effect of a particular classification score?

A. Like I said, I haven't -- the difference with the classification scores shows the threat level you are. When you get the VIO removed, if you have a VIO on you, you're still considered a threat to the public, threat to

Page 47

others and a threat to staff. A VIO removal is a total opposite. You're not a threat to the public, you're not a threat to staff, and you're not a threat to other inmates. So I would say that. That's to me, huge.

Q. Other than what we talked about, are you aware of any other effects of a particular classification score?

A. Yeah. You're housed with more violent offenders. You know, if you have a VIO, you're still stuck with the same people who are more often not prone to social behavior. So if I were to have my VIO removed, I could get to another facility where people are doing more pro-social activities. You know, it's not -- the yard's not going down in 30 minutes for an alarm. So you can focus more on your rehabilitative efforts as opposed to dealing with people who are still in their antisocial behavior. So it has a detriment as far as the type of inmates that I'm around.

Q. Okay. And other than what you just talked about, are you aware of any other effects of classification score?

A. No.

Q. Just so that I'm -- again, for my own understanding --

A. That's okay.

Q. What's your classification score?

A. I said 19. It's always going to be a 19

Page 48

because of the VIO.

Q. Do you know any more about why your classification score is 19?

A. Yes, I know it's because I'm a sex offender. That's the only reason why. It has nothing to do with my behavior or anything like that. It's strictly because I'm a sex offender.

Q. And I take it that there's some policy behind that; is that correct?

A. Policy, what do you mean?

Q. Is there -- so you're saying that you have this classification score of 19 because of your commitment defense -- or, because you're a sex offender.

So is there some kind of policy that you are aware of that states that sex offenders have to have a class -- have a certain classification score?

A. Yes, it states it in Title 15, mm-hmm.

Q. Are you aware of the particular section in Title 15? And it's fine if you aren't.

A. I'm not aware of the particular section, but I've read it in there.

Q. Okay.

A. Yeah, it's mandatory.

Q. And what is the effect of your having a classification score of 19? What does that mean for you

Page 49

day-to-day?

A. I'm limited in the programs that I could take to further my rehabilitation. It hamstrings me at my board hearings because that would be huge having that going into the board. It limits me to being able to transfer to different facilities, to take their programs. It limits me from the -- being around other inmates who are seeking to further their rehabilitation because I'm stuck with other guys who have their VIOs on with their violent behavior. It's just -- it's just hindering me at every turn as far as what I want to do with my programming. It's just hindering me.

Q. How does it affect your board hearings, you mentioned that?

A. Well, the board has its own particular criteria that it looks for to find you suitable or unsuitable. One of the criterias (sic) for the board is whether you are a current and reasonable risk to the public. Well, if I had a document saying that I'm not a danger, to the public, to the prison, or to other staff, it would be a little difficult to find me unsuitable. Not saying that I would get suitability because it's still up to the board, they have to make that call. But it still looks a little better from my position when I have CDCR telling the BPH that hey, this guy, he's not a threat to the public, he's not a threat to other

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

Page 54

that way, and then we can come back and I'll ask you my remaining questions. Does that work?

A. Sure.

MS. VAZIRANI Okay perfect. And does that work Mr. Fahrenwald? Perfect. It's 12:49, why don't we come back at 1:05, all of us.

THE WITNESS: Okay.

Q. (BY MS. VAZIRANI:) So we're now back on the record.

Mr. Gonzalez, did I ask you any questions during the break?

A. Did you ask me?

Q. Yeah. I just want to confirm for the record.

A. Oh, no.

Q. Okay. Just wanted to ask you for the record and make sure. I just want that on the record.

A. Okay.

Q. So Mr. Gonzalez, I have a few more questions for you about your complaint and about this lawsuit.

First, did you have any interactions with Tumacder after January 9th, 2024?

A. No, no.

Q. And other than what we discussed, did you have any interactions with him prior to that hearing on January 9th, 2024?

Page 55

A. Yeah. I thought about this when we went on break. Before that hearing started, when I came in the room and sat down -- this is before he even -- the hearing got started -- so when I came in the room, the lady in front of me told me to have a seat because I was kind of -- she told me to have a seat. And he chimed in and told me to take my -- my skull cap off. Now, the reason why I had a skull cap, because in January it's cold and I wear a bald head, so I get cold easily when I have wind blowing on -- you know, air blowing on my head. So he told me to take my skull cap off and I asked him why. And I think it took him aback that I even asked, questioning him as to why. And then he said, well, I don't like inmates coming in here with caps on their head. And I said, but you're not really telling me why, is it a security concern or something? He said, can you take the cap off? And then I pointed to the lady that was in front of me and said, she got a cap on. He said, well, that's part of her uniform. I said okay and I took it off. So I think he was kind of perturbed that I questioned him as to why I wanted -- I had to take my cap off. I think he was kind of irritated. That's our only interaction prior to that hearing starting.

Q. Okay. And other than that, and what we discussed earlier, do you recall any other interactions with the Tumacder?

Page 56

A. He might have been -- he might have been on one of my classification hearings because you usually get the same captain, and I don't remember any other captains before him to my mind, because normally I go absentia, but he was on this particular hearing.

Q. But nothing else sticks out in your mind?

A. Nothing -- nothing other than that that particular incident before the hearing started.

Q. Okay. Were you physically injured as a result of Tumacder's conduct?

A. Physically? I mean, if you want to count migraine headaches. Yeah, migraine. I don't know if you've ever had a migraine headache before, but I've been having them, I just put an order in last night because I've been having them, they've resurfaced. But usually after a hearing, I do get headaches because they're stressful, you know, so.

Q. Any other physical injuries as a result of Tumacder's conduct?

A. No.

Q. Were you mentally injured as a result of Tumacder's conduct?

A. Yeah. I would -- I would say I was. I felt I was. I felt that he wasn't treating me like a person and he just treated me like a number. You know, he didn't consider

Page 57

any of my evidence. He didn't consider, you know, any of the self-help stuff that I took and I just had finished a seven month long course in CBI and I felt proud of myself, so I wanted to show that off. And I just felt he didn't treat me like a person.

Q. Were there any other ways in which you believe you were mentally injured as a result of Tumacder's conduct?

A. That's the only thing I can think of at the moment.

Q. And do you have any witnesses to support your allegations against Tumacder?

A. Just the people that were in the room.

Q. And by people in the room, there were the other two staff members?

A. Yeah. There were the other two staff members, but I don't even recall their names, but I got them on my paperwork because they all had to sign it, so.

Q. Anyone else who was present?

A. No.

Q. And do you have any other documents to support your allegations against Tumacder other than what we discussed?

A. All the documents that I have supporting my position I are in my central file.

Q. Is there anything else that you think is

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800) 367 3376)

EXHIBIT "C"


ROB BONTA
Attorney General of California
KYLE A. LEWIS
Supervising Deputy Attorney General
ISHA VAZIRANI
Deputy Attorney General
State Bar No. 354914
    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
    Telephone: (415) 510-3478
    Fax: (415) 703-5843
    E-mail: Isha.Vazirani@doj.ca.gov
*Attorneys for Defendant*
*Tumacder*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| GONZALEZ,<br><br>                                    Plaintiff,<br><br>                v.<br><br>TUMACDER, et al.,<br><br>                                    Defendant. | 3:24-cv-06675-RFL<br><br>**DEFENDANT TUMACDER'S RESPONSES TO PLAINTIFF'S INTERROGATORIES; SET ONE** |

PROPOUNDING PARTY:        PLAINTIFF GONZALEZ

RESPONDING PARTY:         DEFENDANT TUMACDER

SET NO.:                               ONE

## PRELIMINARY STATEMENT

The information provided in these responses is true and correct, according to Defendant's best knowledge at this time, but it is subject to future correction for omissions, errors, or mistakes. Defendant reserves the right to produce evidence of any subsequently discovered facts or interpretations thereof, and to amend, modify, or otherwise change the responses, in

1

C-1

In as much detail as possible, please state what is the purpose in conducting a post Board classification hearing in plaintiff Eric L. Gonzalez' case.

**RESPONSE TO INTERROGATORY NO. 2:**

Defendant objects to this interrogatory on the basis that it is vague and ambiguous as to the terms "purpose" and "conducting" such that Defendant must speculate regarding their intended meaning. Defendant further objects to this interrogatory on the basis that it is overly broad in scope.

Notwithstanding Defendant's objections, California Department of Corrections and Rehabilitation's (CDCR) Parole Hearing Process Handbook states:

> Within 15 calendar days of an incarcerated person's parole hearing, the person will appear before CDCR's Post-Board Unit Classification Committee. The purpose of this meeting is to go over any recommendations made by the hearing panel. For example, the hearing panel may recommend the person comply with prison rules (i.e., remain "disciplinary free"), attend relevant programming, or pursue vocational opportunities. The classification committee reviews these recommendations with the person and helps them understand what actions to take to meet the Board's recommendations. The Post-Board Unit Classification Committee will occur only after a parole hearing that results in a grant, denial, or stipulation. If a hearing results in a tie vote, the Post-Board Unit Classification Committee will occur once there is a final decision (after "en banc" review by a panel of commissioners at a monthly executive board meeting)
> (Parole Hearing Process Handbook at 2.26.)

Post-Board Unit Classification Committee hearings are for the purpose of reviewing inmates' case factors, notifying them of the denial of parole, and documenting the denial of parole with Unit Classification Committee action.

**INTERROGATORY NO. 3:**

When did the California Department of Corrections and Rehabilitation ("CDCR") enact the mandatory minimum classification score of 19 for inmates who are required to register per Penal Code 290?

**RESPONSE TO INTERROGATORY NO. 3:**

Defendant objects to this interrogatory on the basis that it seeks discovery that is not relevant to the claim or defense of any party. Plaintiff's claim pertains to *his* classification

3

C - 2

EXHIBIT

BOARD OF PAROLE HEARINGS                                            STATE OF CALIFORNIA
PROPOSED PAROLE CONSIDERATION DECISION

## DECISION - INITIAL HEARING

☐ Parole Granted - (Yes)
   **CDCR: Do not release inmate before Governor's review.**
☒ Parole Denied - (No)   __5__   Year(s)
☐ Inmate Signed Stipulation of Unsuitability for  ____  Year(s)
☐ Inmate Signed Voluntary Waiver for  ____  Year(s)
☐ Split Decision
☐ Term Calculation Only -
☐ Continue  ____  Month(s)
☐ Hearing Postponed   Length:  ____ Month(s)

Reason(s):

## PANEL RECOMMENDATIONS

**The Board Recommends:**

☒ No more 115's or 128A's
☒ Work to reduce custody level
☒ Stay discipline free
☒ Earn positive chronos
☐ Recommend transfer to
☐ Other

**As Available**

☒ Get self-help
☐ Learn a trade
☐ Get therapy
☐ Get a GED

## PRESENT AT HEARING

Inmate Attorney          SIRIWONG, PERAYA

## HEARING PANEL

CHAPPELL, KEVIN - Commissioner                              Date: 06/23/2022

ADAMS, ELEANORE - Deputy Commissioner                      Date: 06/23/2022

This form and the Board's decision at the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

NAME: GONZALEZ          CDC #: E66196          INST: CTF          SCHEDULED DATE: 06/23/2022

BPH 1001                                                                      Page 1 of 5

EXHIBIT

STATE OF CALIFORNIA

# CDC Reclassification Score Sheet

DEPARTMENT OF CORRECTIONS

## II. RECALCULATION OF SCORE

### A. UNFAVORABLE BEHAVIOR SINCE LAST REVIEW

Last Review Date

| 1 | 0 | – | 1 | 5 | – | 9 | 2 | 24 |

mo        day        year

1. Number of serious disciplinaries
dates: _____ × 6 = [ | ] 30

2. Number of escapes during current period
date: _____ × 8 = [ | ] 32

3. Number of physical assaults on staff
date: _____ × 8 = [ | ] 34

4. Number of physical assaults on inmates
date: _____ × 4 = [ | ] 36

5. Number of smuggling/trafficking in drugs
date: _____ × 4 = [ | ] 38

6. Number of deadly weapon possessions
date: _____ × 16 = [ | ] 40

7. Number of inciting disturbance
date: _____ × 4 = [ | ] 42

8. Number of assaults that caused serious injury
date: _____ × 16 = [ | ] 44

9. TOTAL UNFAVORABLE POINTS = + 0

### B. FAVORABLE BEHAVIOR SINCE LAST REVIEW

9-13-72 To
9-13-93

Number of Six Month Periods

1. Continuous minimum custody   N/A × 4 = [ ] 46

2. Continuous dorm living 11-24-92   1 × 2 = 2 48

3. No serious 115's   2 × 2 = 4 50

4. Average or above performance in work, school, or vocational program
11-24-92   2 × 2 = 4 52

5. TOTAL FAVORABLE CREDITS = – 10

### C. COMPUTATION OF CLASSIFICATION SCORE

1. Prior Classification Score = [ | 2 | 5 ] 54

2. Net Change in Behavior Score (A.9 minus B.5) = [ – | 1 | 0 ] 57
   (+ or –)

3. Change in term points = [ | | ] 60
   (+ or –)

4. Current Classification Score = [ | 1 | 5 ] 63

## III. PLACEMENT

### A. SPECIAL CASE FACTORS

1. Placement Concerns

   a) Hold (enter A,P, or *) Felony [ ] 66  INS [ ] 67
   b) Restricted Custody Suffix (enter R or *) [ R ] 68
   c) Medical Restriction (enter FULL, REST, UNAS, or *) [ | | | | ] 69

2. Other Placement Concerns
   a) (*) [ | R | A | P ] 73
   b) (*) [ | | | ] 77

3. Caseworkers

   a) Counselor [ H | A | N | S | E | N | | | E ] 81
   Last Name          FI

   b) Supervisor [ S | M | I | T | H | | | | P ] 90
   Last Name          FI

4. Current custody [ M | I | N | – | A | – | R | | ] 99

5. Current Institution and Facility [ C | C | I | – | I | I | . ] 107

### B. CLASSIFICATION STAFF REPRESENTATIVE ACTION

1. Classification Staff Representative [ R | O | W | E | | | ] 114
   Last Name

2. Date of CSR Action

| 0 | 8 | – | 2 | 3 | – | 9 | 3 | 122 |

mo        day        year

3. Administrative Determinants
   a) (*) [ ]   PRIMARY [ R | A | P ] 128
   b) (*) [ | | ] 132
   c) (*) [ | | ] 136

4. Placement Approved   a) Cat. [ ]

   b) Institution and Facility [ C | C | I | – | I | | ] 141

5. Reason for Administrative or Irregular Placement [ | | ] 148

## I. IDENTIFYING INFORMATION

A. CDC NUMBER

| E | 6 | 6 | 1 | 9 | 6 | 1 |

C. DATE OF CURRENT REVIEW

| 0 | 8 | – | 1 | 7 | – | 9 | 3 | 15 |

mo        day        year

B. INMATE'S LAST NAME

| G | O | N | Z | A | L | E | Z | 7 |

D. PAROLE VIOLATOR ADMISSION TYPE (enter RTC or WNT) [ | | ] 21

MAILED TO OFFICE
INFORMATION SERVICES
BRANCH ON 8-26-93

CSR

CDC FORM 840 (6/87)

Annual

STATE OF CALIFORNIA

# CDC Reclassification Score Sheet

DEPARTMENT OF CORRECTIONS

## II. RECALCULATION OF SCORE

### A. UNFAVORABLE BEHAVIOR SINCE LAST REVIEW

Last Review Date

| 0 | 8 | - | 1 | 7 | - | 9 | 3 | 24 |

mo    day    year

1. Number of serious disciplinaries
dates: _____ × 6 = [ ] 30

2. Number of escapes during current period
date: _____ × 8 = [ ] 32

3. Number of physical assaults on staff
date: _____ × 8 = [ ] 34

4. Number of physical assaults on inmates
date: _____ × 4 = [ ] 36

5. Number of smuggling/trafficking in drugs
date: _____ × 4 = [ ] 38

6. Number of deadly weapon possessions
date: _____ × 16 = [ ] 40

7. Number of inciting disturbance
date: _____ × 4 = [ ] 42

8. Number of assaults that caused serious injury
date: _____ × 16 = [ ] 44

9. TOTAL UNFAVORABLE POINTS = + 0

### B. FAVORABLE BEHAVIOR SINCE LAST REVIEW

Number of Six Month Periods

1. Continuous minimum custody      2 × 4 = 8  46

2. Continuous dorm living  9/93    2 × 2 = 4  48

3. No serious 115's  9/94 to      2 × 2 = 4  50

4. Average or above performance in work, school, or vocational program   2 × 2 = 4  52

5. TOTAL FAVORABLE CREDITS = − 20

### C. COMPUTATION OF CLASSIFICATION SCORE

1. Prior Classification Score = [ 1 5 ] 54

2. Net Change in Behavior Score (A.9 minus B.5) = [ − 2 0 ] 57
(+ or −)

3. Change in term points = [ ] 60
(+ or −)

4. Current Classification Score = [ 0 ] 63

## III. PLACEMENT

### A. SPECIAL CASE FACTORS

1. Placement Concerns

a) Hold (enter A, P, or *) Felony [ ] 66  INS [ ] 67
b) Restricted Custody Suffix (enter R or *) [ R ] 68
c) Medical Restriction (enter FULL, REST, UNAS, or *) [ ] 69

2. Other Placement Concerns
a) ( * ) [ ] 73
b) ( * ) [ ] 77

3. Caseworkers
a) Counselor

| S | A | N | C | H | E | Z | | | | D | 81 |

Last Name    FI

b) Supervisor

| K | A | B | L | E | R | | | | J | 90 |

Last Name    FI

4. Current custody

| M | I | N | - | A | - | R | | | 99 |

5. Current Institution and Facility

| C | C | I | | - | I | 1 | | 107 |

### B. CLASSIFICATION STAFF REPRESENTATIVE ACTION

1. Classification Staff Representative

[ ] 114

Last Name

2. Date of CSR Action

[ ] − [ ] − [ ] 122
mo    day    year

3. Administrative Determinants
a) ( * ) [ ]  PRIMARY [ ] 128
b) ( * ) [ ] 132
c) ( * ) [ ] 136

4. Placement Approved    a) Cat. [ ]

b) Institution and Facility

[ ] − [ ] 141

5. Reason for Administrative or Irregular Placement

[ ] 148

## I. IDENTIFYING INFORMATION

A. CDC NUMBER

| E | 6 | 6 | 1 | 9 | 6 | 1 |

B. INMATE'S LAST NAME

| G | O | N | Z | A | L | E | Z | 7 |

C. DATE OF CURRENT REVIEW

| 0 | 9 | - | 2 | 0 | - | 9 | 4 | 15 |
mo    day    year

D. PAROLE VIOLATOR ADMISSION TYPE (enter RTC or WNT) [ ] 21

E-2

CDC FORM 840 (6/87)

STATE OF CALIFORNIA

# CDC Reclassification Score Sheet

DEPARTMENT OF CORRECTIONS

## II. RECALCULATION OF SCORE

### A. UNFAVORABLE BEHAVIOR SINCE LAST REVIEW

Last Review Date

| 0 9 | - | 2 0 | - | 9 4 | 24 |
| mo | | day | | year | |

1. Number of serious disciplinaries
dates: _____ _____ × 6 = [ 6 ] 30

2. Number of escapes during current period
date: _____ × 8 = [   ] 32

3. Number of physical assaults on staff
date: _____ × 8 = [   ] 34

4. Number of physical assaults on inmates
date: _____ × 4 = [   ] 36

5. Number of smuggling/trafficking in drugs
date: _____ × 4 = [   ] 38

6. Number of deadly weapon possessions
date: _____ × 16 = [   ] 40

7. Number of inciting disturbance
date: _____ × 4 = [   ] 42

8. Number of assaults that caused serious injury
date: _____ × 16 = [   ] 44

9. TOTAL UNFAVORABLE POINTS = + 0

### B. FAVORABLE BEHAVIOR SINCE LAST REVIEW

Number of Six Month Periods

1. Continuous minimum custody   1 × 4 = [ 4 ] 46

2. Continuous dorm living  9/94   1 × 2 = [ 2 ] 48

3. No serious 115's  to 9/95   1 × 2 = [ 2 ] 50

4. Average or above performance in work, school, or vocational program   1 × 2 = [ 2 ] 52

5. TOTAL FAVORABLE CREDITS = - 10

### C. COMPUTATION OF CLASSIFICATION SCORE

1. Prior Classification Score = [ 0 ] 54

2. Net Change in Behavior Score -4 (A.9 minus B.5) = [ - ] [ 1 0 ] 57
(+ or −)

3. Change in term points = [   ] 60
(+ or −)   0

4. Current Classification Score = [ 0 ] 63

## III. PLACEMENT

### A. SPECIAL CASE FACTORS

1. Placement Concerns

a) Hold (enter A, P, or *) Felony / INS   [  ] 66  [  ] 67
b) Restricted Custody Suffix (enter R or *)   [ R ] 68
c) Medical Restriction (enter FULL, REST, UNAS, or *)   [        ] 69

2. Other Placement Concerns
a) ( * )   [        ] 73
b) ( * )   [        ] 77

3. Caseworkers
a) Counselor   | S A N C H E Z      | D | 81
Last Name                                  FI

b) Supervisor   | N E W M A N        | J | 90
Last Name                                  FI

4. Current custody   | M I N | - | A | R    | 99

5. Current Institution and Facility   | C C I | - | I |   | 107

### B. CLASSIFICATION STAFF REPRESENTATIVE ACTION

1. Classification Staff Representative   [              ] 114
Last Name

2. Date of CSR Action   [   ] - [   ] - [   ] 122
mo   day   year

3. Administrative Determinants
a) ( * )  PRIMARY   [   ] [      ] 128
b) ( * )   [      ] 132   c) ( * )   [      ] 136

4. Placement Approved   a) Cat.   [   ]
b) Institution and Facility   [      ] - [   |   ] 141

5. Reason for Administrative or Irregular Placement   [      ] 148

## I. IDENTIFYING INFORMATION

A. CDC NUMBER   | E | 6 6 1 9 6 | 1

B. INMATE'S LAST NAME   | G O N Z A L E Z | 7

C. DATE OF CURRENT REVIEW   | 0 9 | - | 0 5 | - | 9 5 | 15
mo   day   year

D. PAROLE VIOLATOR ADMISSION TYPE (enter RTC or WNT)   [      ] 21

(SEG 7/95)

E-3

CDC FORM 840 (8/87)

EXHIBIT <u> "F"</u>


NAME and NUMBER  *Gonzales  EC6196*                    CDC-128-B (Rev. 4/74)

This serves as notification that pursuant to Administrative Bulletin 94/10, Family Visiting
Program Limitation Imposed by Budget Act of 1994, you are ~~eligible/ineligible~~ to participate
in the California Department of Corrections Family Visiting Program.

_____    _____    _____    _____
INMATE SIGNATURE              DATE      CC-I SIGNATURE                  DATE

DATE *7-18-94*                                                GENERAL CHRONO

EXHIBIT

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
EXECUTIVE OFFICE

P.O. Box 4036
Sacramento, CA 95812-4036



features. Mr. Gonzalez could not cope with perceived rejection, manage conflict, or regulate his emotions in a healthy way. He perpetrated emotional and psychological abuse in his intimate relationships. He engaged in destructive behaviors and unleashed his anger by committing serial rapes against prostitutes, whom he objectified, treated as inferior, and used for his sexual gratification. In prison, he continued to be a management problem until 2019, incurring several rule violations. However, during his incarceration, rule violations notwithstanding, Mr. Gonzalez also embarked on a self-betterment path. This has become especially evident in recent years, during which he has actively pursued personal growth and self-improvement through self-help groups and correspondence programs. He has not incurred any violence related rule violations during his incarceration, and no infractions in general since 2019. Mr. Gonzalez presented as a reflective and a forthcoming individual, who has gained a deeper understanding of self and how to live more effectively and positively. He appeared to be an individual who has been engaged in examining his history of sexual offenses and in making necessary changes in his thinking patterns, attitudes, and behaviors to address his risk factors. During the interview, it was apparent to this evaluator that Mr. Gonzalez has examined the nexus between his childhood trauma, domestic violence, and sexual violence against women. Moreover, his maladaptive personality appeared to have attenuated significantly. At the time of the interview, Mr. Gonzalez came across as self-reflective and non-defensive and evidenced no signs of characterological defects in his presentation or demeanor.

**Analysis of Clinical Risk Factors and Current Relevance:**
Clinical domain factors reflect Mr. Gonzalez's behavior and functioning in the last three years. During this period, he has been behaviorally and psychologically stable. He has not evidenced violent ideation/behavior or problematic supervision response. He has also engaged in a number of groups in a meaningful way to work on deeper understanding of his external and internal motivators and he appears to have internalized the lessons, which further mitigates his risk. Therefore, violent ideation or intent, symptoms of major mental disorder, instability, or treatment of supervision response were not deemed present or relevant to his risk of violence. He was considered to be in the maintenance stage of change, sustaining positive changes he implemented during the incarceration.

Asked how he felt today about his previous offenses, Mr. Gonzalez expressed that he felt sad. He indicated an understanding of the gravity of the impact his behavior had on his victims. He recalled speaking to a victim during one of victim impact groups, and noted,

> "What she described to me was pure terror. I would never terrorize women that way again. Me being able to read that book, the psychological effects women go through...I am disgusted with myself, disgusted I did that. I could have prevented all of that, I traumatized women who will need to live with that for the rest of their lives. I am disgusted I did that and really wish I could take it back."

Mr. Gonzalez opined that he has changed in many ways since his incarceration, but most importantly, "My view on women is night and day...I look at women differently, I started valuing women." He noted that the victim he spoke to told him that the best thing he can do for her was to live right. Mr. Gonzalez communicated, "I take that to heart. I look at women differently. There are no women hanging up in my room, no music that degrades women, no Friday 13, predatory against women, everything I watch is educational and nothing predatory and abusive."

Asked about factors that would place him at risk to reoffend, Mr. Gonzalez verbalized,

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

## BOARD OF PAROLE HEARINGS
### EXECUTIVE OFFICE

P.O. Box 4036
Sacramento, CA 95812-4036



| | | |
|---|---|---|
| • Emotional detachment from his mother<br>• Lack of secure attachments<br>• Lack of concern for others<br>• Attitudes tolerant of sexual crime<br>• Impulsive lifestyle | insecure<br>• Anger management problems<br>• Poor emotional regulation skills<br>• Relationship stressors<br>• Rejection | • Ineffective coping skills<br>• Low self-esteem<br>• Cognitive distortions<br>• Hostility toward women<br>• Externalizing blame |

**Conclusion:** The Static-99R score placed the examinee in the *Above Average (IVa)* Risk level relative to other individuals with a history of sexual offending. This means that he scored equal to or higher than about 89% of sex offenders in the Static-99R standardization sample. The review of an individualized assessment of aggravating versus mitigation/protective risk factors suggests that this individual's risk for sexual re-offense is reduced by the mitigating/protective factors.

## RISK OF FUTURE VIOLENCE: CASE FORMULATION AND OPINIONS

Generally speaking, the current recidivism rates for long-term incarcerated persons are lower than those of other individuals released from shorter sentences. The Board defines overall risk ratings relative to other long-term incarcerated persons and supervised individuals.

### Most Relevant / Salient Violence Risk Considerations:
- Unavailability of his victim pool in a prison setting
- Relatively recent engagement in sex offender treatment program
- Significant historical hostility towards women – when rejected, he has displaced his anger from the person who rejected him and sexually assaulted prostitutes, who he saw as acceptable victims
- Trauma-related hypersensitivity to abandonment and related displaced anger

### Most Relevant / Salient Desistance or Mitigating Considerations:
- Responsiveness to feedback from prior BPH denial
- Engaged in sex offender treatment (e.g., Road to Freedom); motivated to continue this type of treatment
- Developed positive coping and problem-solving skills
- Sought out organizational support appropriately
- No rule violations since 2019
- No documented violence for the duration of his prison term
- Presented as motivated toward desistance
- Comprehensive parole and relapse prevention plans that were commensurate to his treatment needs
- Expressed what came across as genuine remorse and regret unprompted and spontaneously throughout the interview
- Appeared to have developed a fairly thorough self-understanding, victim empathy, and has learned to manage his negative emotions and impulses.

### Risk Management Recommendations:
- Continue to avail himself of psychoeducational and rehabilitative resources (e.g., The Road to Freedom, The Adult Relapse Prevention Workbook, Building a Better Life: A Good Lives and Self-Regulation Workbook)

G-2

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    GAVIN NEWSOM, GOVERNOR

**BOARD OF PAROLE HEARINGS**
EXECUTIVE OFFICE

P.O. Box 4036
Sacramento, CA 95812-4036



- Continue to engage in rehabilitative programming focused on productive and healthy conflict resolution skills, identifying healthy versus unhealthy relationships, prosocial decision making, and anger management
- Maintain positive programming and positive, prosocial mindset
- Focus in his treatment on his trauma-related feelings of rejection, which historically have been foundational to his repeated sexual assaults of prostitutes in the community.

**Overall Categorical Risk Rating:**
Based upon an analysis of the presence and relevance of empirically supported risk factors, case formulation of risk, and consideration of Mr. Gonzalez's anticipated risk management needs if granted parole supervision (i.e., intervention, monitoring), Mr. Gonzalez represents a Low risk for violence. He presents with non-elevated risk relative to long-term incarcerated persons and other persons under supervision. Low-risk examinees are expected to commit violence much less frequently than all other persons under supervision.

Mr. Gonzalez's risk was rated as Moderate (Moderate) in his 2022 CRA. Since then, Mr. Gonzalez has continued to address the Board's concerns as well as the concerns cited in his last CRA. He has engaged in sex-offender treatment, presented with a more thorough understanding of his causative factors, created a relapse prevention plan including his sexual offending risk factors, and has remained disciplinary free.

_(signature)_

Angelika Marsic, PhD., CA License # 26475
Forensic Psychologist
Board of Parole Hearings / Forensic Assessment Division
California Department of Corrections and Rehabilitation

Reviewed by:

_(signature)_

Craig R. Lareau, J.D., Ph.D., ABPP, CA Psychology License # PSY-17232
Senior Psychologist, Supervisor
Board of Parole Hearings / Forensic Assessment Division
California Department of Corrections and Rehabilitation

**DATE APPROVED:** 05/07/2025

G-3

EXHIBIT "H"

State of California

# California Code of Regulations

# Title 15.   Crime Prevention and Corrections



## Division 3

## Rules and Regulations of

## Adult Institutions, Programs, and Parole

## Department of Corrections and Rehabilitation

### Updated through July 2022

H-1

§ 3164                    DEPARTMENT OF CORRECTIONS AND REHABILITATION                    TITLE 15

violations of regulations and established procedures relate directly to such activities. An inmate will not be barred from giving or receiving legal assistance for violations of regulations and procedures which are unrelated to providing or receiving legal assistance. However, no otherwise prohibited contacts or access to prohibited areas will be permitted because of this regulation.

NOTE: Authority cited: section 5058, Penal Code. Reference: *Johnson v. Avery*, 89 S. Ct. 747 (1969).

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).
2. Amendment filed 10-7-82; effective thirtieth day thereafter (Register 82, No. 41).

### 3164.   Administrative Segregation.

(a) Inmates confined in administrative segregation for any reason will not be limited in their access to the courts.

(b) During a period of disciplinary detention, as described in Section 3330, legal resources may be limited to pencil and paper which will be provided upon request for correspondence with an attorney or the preparation of legal documents for the courts. Other legal material in the inmate's personal property may be issued to an inmate in disciplinary detention if litigation was in progress before the inmate's placement in disciplinary detention and legal due dates are imminent.

(c) Inmates who are housed in any restricted unit and who are not serving a period of disciplinary detention may possess and have access to any legal resource material available to the general population and may assist each other in their legal work to the extent compatible with institution security. For the purpose of this subsection, restricted units include reception centers, institution reception or orientation units, controlled housing and security housing units.

(d) An inmate in a restricted housing unit may have access to an inmate law library subject to the provisions of section 3123.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

HISTORY:

1. Amendment filed 10-7-82; effective thirtieth day thereafter (Register 82, No. 41).
2. Repealer and new subsection (d) filed 11-24-2009; operative 12-24-2009 (Register 2009, No. 48).

### 3165.   Mailing Legal Documents.

(a) The mailing of legal documents to courts and claims to the Department of General Services, Office of Risk and Insurance Management (DGS ORIM) is the inmate's responsibility. Mail designated by the inmate as legal mail will be delivered to the facility mail room for inspection, pursuant to Sections 3144 and 3145, and mailing in accordance with local facility mail procedures. The mail room shall maintain a current address list of federal, state, county, appellate, and district courts. The mail room will send mail out each working day.

(b) With each transmittal of mail to a court or claim filed with the DGS ORIM requiring the addition of postage, the inmate must submit a signed CDC Form 193, Trust Account Withdrawal Order. The mail room will remove the trust account withdrawal order, enter the amount of postage required, and forward the order to the trust office for processing. Mail addressed to a court or claims addressed to the DGS ORIM will be posted on the inmate's CDC Form 119, Mail Record.

(c) Notarization of legal documents shall be available at all institutions. The inmate shall pay the established notary fee for such service unless the inmate is indigent as defined in Section 3000. When the inmate requests notarization, they shall indicate which document they request to have notarized.

(d) The cost of postage for mailing documents to the courts shall be charged against an inmate's trust account unless the inmate is indigent at the time the documents are submitted for mailing.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5007.7, Penal Code; and *In re Jordan*, 7 Cal. 3rd 930 (1972).

HISTORY:

1. Amendment filed 9-30-77; effective thirtieth day thereafter (Register 77, No. 40).
2. New subsection (d) filed 4-18-80; effective thirtieth day thereafter (Register 80, No. 16).
3. Amendment filed 10-7-82; effective thirtieth day thereafter (Register 82, No. 41).
4. Amendment of subsections (a) and (b) and amendment of Note filed 11-18-96; operative 12-18-96 (Register 96, No. 47).
5. Amendment of subsection (d) filed 11-24-2009; operative 12-24-2009 (Register 2009, No. 48).
6. Change without regulatory effect amending subsections (a) and (b) filed 1-8-2014 pursuant to section 100, title 1, California Code of Regulations (Register 2014, No. 2).
7. Amendment of section and Note filed 9-17-2020; operative 1-1-2021 (Register 2020, No. 38). Filing deadline specified in Government Code section 11349.3(a) extended 60 calendar days pursuant to Executive Order N-40-20 and an additional 60 calendar days pursuant to Executive Order N-66-20.

## Article 7.   Visiting

### 3170.   General Visiting.

(a) These regulations are made in recognition and consideration of the value of inmate visitation as a means of increasing safety in prisons, maintaining family and community connections, and preparing inmates for successful release and rehabilitation. It is the intent of these regulations to establish a visiting process in the institutions/facilities of the department that is conducted in as accommodating a manner as possible, subject to the need to maintain order, the safety of persons, the security of the institution/facility, and required prison activities and operations.

(b) The privacy of inmates and their visitors shall be respected subject to the need to verify the identity of an inmate or visitor; enforce laws, regulations, and procedures; and/or ensure the safety of persons and institution/facility security. Video-recording devices may be utilized in visiting areas, excluding family visiting units or confidential attorney consultation areas.

(c) Visits with inmates may, without prior notification, be terminated, temporarily suspended, or modified in response to an institution/facility emergency as determined by the institution head or designee. Emergency modifications of the visiting schedule shall be posted at the institution/facility as soon as practical and will be included in the automated telephonic visiting information system.

(d) Devices that do not allow physical contact between inmates and visitors shall not normally be used, except as provided in section 3170.1 or as necessary in the following circumstances:

(1) Physical contact with a visitor(s), or with other inmates, will seriously endanger the safety of persons or the security of the institution/facility,

(2) As a temporary measure for willful failure or refusal to abide by visiting regulations.

(e) Each inmate and visitor is responsible for his or her own conduct during visits. Any violation of laws, regulations, or local procedures governing visits may result in termination, suspension, revocation, or denial of visiting with the person or persons involved, as described in section 3176. Such violation may also result in exclusion from the facility, as described in section 3176.3.

(f) Reasonable accommodation shall be afforded visitors and inmates with disabilities to facilitate their full participation in contact, non-contact, or family visiting as provided in these rules.

114

(3) Whether or not the inmate requests a witness, witnesses may be called if the official conducting the hearing determines the witnesses may have information necessary to the finding of fact.

(4) The reporting employee shall attend the disciplinary hearing or be available for questioning via speakerphone if requested by the inmate.

(5) Under the direction of the official conducting the disciplinary hearing, the inmate has the right to ask questions of all witnesses called. The SHO will screen all questions to ensure they are relevant to the violation charged.

(6) Nothing in this section shall preclude making a witness available by speaker phone for a disciplinary hearing.

(f) Disposition. Upon completion of the fact-finding portion of the disciplinary hearing, the inmate may be found:

(1) Not guilty and the charges dismissed.

(2) Guilty of an administrative rather than a serious rule violation. In such case, the RVR shall be reduced to an administrative level offense and the inmate may be assessed only a disposition authorized in section 3314.

(3) Guilty as charged or guilty of an included serious rule violation and assessed a credit forfeiture pursuant to section 3323.

(4) If the violation included an act related to the use, possession, or distribution of controlled substances, controlled medication, drugs or drug paraphernalia; or if the inmate refused to submit to a test for controlled substances or drugs, the disposition shall include an order for the inmate to submit to mandatory random drug testing for one year from the date of the order.

(A) For the first offense, the inmate shall be retested within 90 days.

(B) For the second and all subsequent offenses, the inmate shall be placed in the MRDT program, and must provide one random drug test every 90 days for one year. With each subsequent positive test result and guilty finding, the Senior Hearing Officer shall reset the mandatory testing period.

(C) The inmate shall be informed that refusal to submit to a random test or any positive test result during the mandatory random drug-testing period shall result in the issuance of a RVR and a new mandatory drug testing order.

(5) The disposition may or when mandated shall include assessment of one or more of the following:

(A) Any combination of penalties authorized for administrative rule violations in section 3314(e).

(B) Suspension of privileges specified by the hearing official for no more than a 90-day period starting the date the rule violation report was adjudicated. The suspension of privileges for violations of subsections 3016(a), 3016(b), 3016(d), and 3290(d) shall be assessed as follows:

1. Thirty days for the first offense.

2. Sixty days for the second offense.

3. Ninety days for the third offense.

(C) Placement into privilege group B or C for no more than a 90-day period starting from the date the rule violation report was adjudicated. Inmates placed into Privilege Group C as a result of a disciplinary action who are participating in the Mental Health Services Delivery System at the Enhanced Outpatient Program level of care or higher shall be referred to the Interdisciplinary Treatment Team by the hearing official by documenting the information on a CDCR Form 128-MH5 (Rev. 05/14), Mental Health Referral Chrono, as a routine referral for program review.

(D) Disciplinary detention or confinement to quarters as provided in sections 3330 and 3333 for not more than a ten-day period. If facility security will not be jeopardized, the inmate shall be released to attend work and program assignments.

1. Second offense violations of subsections 3016(a), 3016(b), 3016(d), and 3290(d) shall result in confinement to quarters for five days.

2. Third and all subsequent offense violations of subsections 3016(a), 3016(b), 3016(d), and 3290(d) shall result in confinement to quarters for 10 days.

(E) Referral to a classification committee for consideration of placement in Work Group C.

(F) Suspension of all or part of dispositions other than credit forfeitures, ordered random drug testing and classification committee referrals, for up to six months based on the inmate's compliance with the conditions specified for suspension.

(G) Imposition of all or part of an existing suspended disposition when the current rule violation is a violation of conditions specified in a suspended disposition. Imposition of a suspended disposition shall not include confinement to quarters or disciplinary detention for a period exceeding ten days except as provided in section 3322.

(H) For a violation of subsection 3016(d), there shall be a loss of visits for one year to be followed by non-contact visits for two years. In addition, the following loss of family visiting (overnight) shall apply upon conclusion of the non-contact visiting restriction:

1. Loss of family visiting (overnight) program for three years for first offense.

2. Loss of family visiting (overnight) program for seven years for second offense.

3. Permanent exclusion from family visiting (overnight) program for third offense.

(I) Loss of visits to be followed by non-contact visits for violations of subsection 3016(a), 3016(b) (with the exception of alcohol violations), or 3290(d) shall be as follows:

1. Loss of visits for 90 days, to be followed by non-contact visits for 90 days and loss of family visiting (overnight) program for one year upon conclusion of the non-contact restriction for the first offense.

2. Loss of visits for 90 days, to be followed by non-contact visits for 180 days and loss of family visiting (overnight) program for three years upon conclusion of the non-contact restriction for the second offense.

3. Loss of visits for 180 days, to be followed by non-contact visits for 180 days and loss of family visiting (overnight) program for five years upon conclusion of the non-contact restriction for the third offense.

(J) Violation of subsections 3016(a), 3016(b), 3016(d), and 3290(d) shall result in:

1. For the first offense, the inmate shall be required to attend Alcoholics Anonymous or Narcotics Anonymous, or be placed on a wait list to attend, along with loss of pay for 90 days from a paid work assignment.

2. For the second offense, the inmate shall be referred to a substance use disorder treatment program, provided that program eligibility criteria are met, along with loss of pay for 180 days from a paid work assignment.

3. For the third offense, the inmate shall be referred to a substance use disorder treatment program, provided that program eligibility criteria are met, and mandatory treatment shall be a condition of parole. Additionally, the inmate shall be referred for removal from a paid work assignment for one year.

(K) Violation of Indecent Exposure or Sexual Disorderly Conduct of sections 3007, 3323(d)(9), 3323(f)(4), and 3323(g)(7) shall result in:

1. First offense violation shall result in loss of any or all of the following for up to 90 days: canteen, appliances, inmate packages, telephone privileges, and personal property.

(f) When the inmate's visiting privilege status has been modified or changed, the inmate shall be responsible for promptly notifying his or her visitor(s) of the action taken.

(g) Any suspensions under this section shall not apply to attorney visits including visits by attorney representatives.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 2086, 2772, 2790, 4502, 4535, 4571, 4573, 4573.5, 4573.6 and 5054, Penal Code; and *In re French,* 106 Cal.App.3d 74 (1980).

HISTORY:

1. New section filed 2-18-2003; operative 3-20-2003 (Register 2003, No. 8).
2. Amendment of subsection (c) filed 7-19-2011; operative 8-18-2011 (Register 2011, No. 29).

### 3177. Family Visiting (Overnight).

Institution heads shall maintain family visiting policies and procedures. Family visits are extended overnight visits, provided for eligible inmates and their immediate family members as defined in Section 3000, commensurate with institution security, space availability, and pursuant to these regulations. Each institution shall provide all necessary accommodations, except for food, at no cost to the inmates and their visitors. Institutions shall require eligible inmates to purchase all food for the family visit through the institution family visiting coordinator. Each institution family visiting menu shall provide a balanced variety of nutritional selections. At all CDCR conservation camps, the visitors shall be required to bring all food for the visit.

Only those immediate family members as defined in Section 3000, including registered domestic partners, are authorized for family visits.

(a) When a bonafide and verified foster relationship exists between an inmate and another person, by virtue of being raised in the same foster family, the person may be approved for family visiting with the prior approval of the institution head or designee.

(b) Family visiting is a privilege. Eligibility for family visiting shall be limited by the assignment of the inmate to a qualifying work/training incentive group as outlined in section 3044.

(1) Family visits shall not be permitted for inmates convicted of a violent offense where the victim is a minor or family member or any sex offense, which includes but is not limited to the following Penal Code sections: 187 (when the victim is a family member as defined in Section 3000 or minor); 192 (when the victim is a family member or minor); 243.4; 261; 261.5, 262; 264.1; 266c; 266j; 273a; 273d; 273.5; 273.6; 285; 286; 288; 287; 288.2; 288.5; 289; 289.5; 311.1; 311.2; 311.3; 311.4; 313.1; 314; or 647.6, unless otherwise eligible pursuant to subsection (b)(1)(B) or (C) of this section.

(A) Inmates may be prohibited from family visiting where substantial documented evidence or information of the misconduct described in section 3177(b)(1) exists, without a criminal conviction. The evidence or information appropriate for the purpose of this regulation shall include rule violation reports as well as the standard described in section 3173.1.

(B) Inmates convicted as a minor of a violent offense where the victim was a minor or family member, excluding any sex offense, shall have eligibility for family visiting determined by a classification committee provided the inmate has demonstrated sustained, positive behavior to include: no serious rules violation reports in the last five years and documented participation in self-help groups, e.g., Anger Management, Narcotics Anonymous, Alcoholics Anonymous. The classification committee shall consider the circumstances of the offense involving a minor or family victim in determining whether the inmate poses a threat of harm to visitors during a family visit. In making its determination, the classification committee shall consider, but is not limited to, arrest reports, probation officer reports, court transcripts, parole revocation transcripts.

(C) Inmates convicted of a violent offense where the victim was a minor or a family member, excluding any sex offense, may be eligible for family visiting as determined by a classification committee providing the inmate has demonstrated sustained, positive behavior to include: no serious rules violation reports in the last ten years and documented participation in self-help groups, e.g., Anger Management, Narcotics Anonymous, Alcoholics Anonymous. The classification committee shall consider the circumstances of the offense involving a minor or family victim in determining whether the inmate poses a threat of harm to visitors during a family visit. In making its determination, the classification committee shall consider, but is not limited to, arrest reports, probation officer reports, court transcripts, parole revocation transcripts.

(D) Family visiting shall be restricted as necessary to maintain order, the safety of persons, the security of the institution/facility, and required prison activities and operations, pursuant to section 3170.

(2) Family visits shall not be permitted for inmates who are in any of the following categories:

(A) Designated Close Custody;

(B) Designated a condemned inmate;

(C) Assigned to a reception center;

(D) Assigned to an Administrative Segregation Unit;

(E) Assigned to a Security Housing Unit;

(F) Designated "C" status;

(G) Guilty of one or more Division A or Division B offense(s) within the last 12 months; or

(H) Guilty of distribution of a controlled substance while incarcerated in a state prison, under subsection 3016(d). Loss of family visiting (overnight) in accordance with subsection 3315(f)(5)(H).

(3) Family visits shall be permitted only in CDCR institutions and conservation camps.

(c) Unescorted minors of the inmate's immediate family shall not participate in family visits. Exceptions include an inmate's legal spouse, the inmate's children or legal stepchildren and the inmate's own brothers or sisters when the institution head or designee approves such unchaperoned visits.

(d) Inmates shall not be eligible for a family visit while any action that restricts, suspends, or denies their contact with a visitor or visitors during regular visiting is in effect. Family visits may be revoked or suspended without such action affecting an inmate's eligibility for contact or non-contact visits.

(e) Each inmate shall be subject to disciplinary action, which may include suspension or exclusion from participation in the family visiting program, for any willful damage of the unit and/or furnishings or for failure to maintain the cleanliness of the family visiting program unit.

(f) Visitors failing to report to the visitor processing area by 11:00 a.m. without the notification and approval of the family visiting coordinator are subject to cancellation of the visit and suspension of family visiting program privileges for six months.

(g) Inmates with a disability requiring an accommodation for family visits shall give 72 hours notice of any request for accommodation.

NOTE: Authority cited: Sections 5058 and 6404, Penal Code. Reference: Section 297.5, Family Code; and Section 5054, Penal Code.

HISTORY:

1. Amendment filed 5-13-77; effective thirtieth day thereafter (Register 77, No. 20).
2. Amendment of subsection (c) filed 9-30-77; effective thirtieth day thereafter (Register 77, No. 40).
3. Amendment of subsection (c)(4) and new subsection (c)(13) filed 8-22-79; effective thirtieth day thereafter (Register 79, No. 34).
4. Amendment of subsection (c)(11)(C) filed 4-18-80; effective thirtieth day thereafter (Register 80, No 16).

§ 3375.2                    DEPARTMENT OF CORRECTIONS AND REHABILITATION                    TITLE 15

Level I facility except when approved by the Departmental Review Board.

(12) An inmate whose death sentence is commuted or modified shall be transferred to a reception center for processing after which an ICC action and subsequent endorsement by a CSR shall determine the inmate's initial facility placement.

(13) An inmate with a case factor described in subsections 3377.2(b)(2)(A), 3377.2(b)(2)(B) or 3377.2(b)(2)(C), shall be ineligible for minimum custody. An inmate with a history of one or more walkaways from nonsecure settings, not to include Drug Treatment Furlough, Community Correctional Reentry Centers, and Community Reentry Programs, shall not be placed in minimum custody settings for at least 10 years following the latest walkaway.

(14) A validated STG-I associate or member may be granted Minimum A or Minimum B Custody on a case-by-case basis. Designation of Minimum A or Minimum B Custody for a validated STG-I associate or member requires a review of the totality of the inmate's case factors by an ICC and a determination that their housing with such a level of custody would not pose a threat to the safety and security of the institution, inmates, staff, and public.

(b) The following three-letter codes are used to indicate those administrative or irregular placement conditions known as administrative determinants, which may be imposed by Departmental officials to override the placement of an inmate at a facility according to his/her placement score.

(1) AGE. Inmate's youthfulness, immaturity or advanced age.

(2) ARS. Current conviction, prior conviction, or a sustained juvenile adjudication, as defined in subdivision (b)(28)(A), for arson.

(3) BEH. Inmate's record of behavior indicates they are capable of successful placement at a facility with a security level lower than that which is consistent with his/her placement score. This factor shall not be used for an inmate who is currently housed at a facility with a security level higher than that which is consistent with his/her placement score.

(4) CAM. Placement is recommended due to a shortage of camp qualified inmates.

(5) DEA. Inmate was formerly or is currently sentenced to death.

(6) DEP. Special placement ordered by the Departmental Review Board.

(7) DIS. Inmate's disciplinary record indicates a history of serious problems or threatens the security of the facility.

(8) ENE. Inmate has one or more enemies under the Department's jurisdiction which have been documented on a CDC Form 812 (Rev. 8/01), Notice of Critical Case Information-Safety of Persons or on a CDC Form 812-C (Rev. 8/01), Notice of Critical Information-Confidential Enemies pursuant to section 3378. This should also be used when it is probable that the inmate may be victimized due to case factors; e.g., the nature of their offense is likely to create an enemy situation at certain facilities, current Protective Housing Unit case, and those who are natural victims because of their appearance.

(9) ESC. Unusual circumstances suggest the inmate is a much greater escape risk than indicated by his/her placement score; e.g., the inmate verbalized an intent to escape.

(10) FAM. Inmate has strong family ties to a particular area where other placement would cause an unusual hardship.

(11) HOL. Hold, warrant or detainer is likely to be exercised.

(12) LIF. Inmate is serving a life sentence and requires placement in a facility with a security level higher than that indicated by his/her placement score.

(13) MED. Inmate's medical condition requires treatment or continuing medical attention not available at all facilities.

(14) OUT. Inmate requires placement at a specific facility for an out-to-court appearance. This factor shall also be used when a releasing authority appearance is nearing.

(15) POP. Shall be used only by a CSR to indicate that no beds presently exist at a facility with a security level that is consistent with the inmate's placement score.

(16) PRE. The short time remaining to serve limits or otherwise influences placement or program options for the inmate.

(17) PSY. Inmate's psychological condition requires special treatment or may severely limit placement options. This factor shall also be used for those inmates who are designated as Category B.

(18) PUB. Shall be used only by a CSR to indicate an inmate is identified as a Public Interest Case as defined in section 3000.

(19) REN. Inmate is currently endorsed to or requires transfer to a Reentry Hub program and a Reentry Hub program is not available at a facility with a security level which is consistent with the inmate's placement score.

(20) SCH. Inmate is involved in an academic program which is not available at a facility with a security level that is consistent with his/her placement score.

(21) SDP. Step Down Program. Shall be used to identify an inmate who is currently assigned to the Security Threat Group (STG) Step Down Program (SDP) or who has been assigned in the SDP in the past. This designation shall be assigned upon the inmate's assignment to the SDP and shall be retained upon his transition to general population housing after completion of the SDP. This designation will remain assigned while the validation remains current.

(22) SEC. Shall be used only by a CSR to indicate that the inmate has been designated as a Security Concern by an ICC and requires Close Custody.

(23) SEX. Inmate has a prior incidence of rape, oral copulation, sodomy, or a lewd and lascivious act which requires restricted custody or placement.

(24) SOR. Inmate's bisexual or homosexual orientation may require special placement.

(25) ST1. Security Threat Group-I. Documentation establishes that the inmate's STG-I designation may require special attention or placement consideration, while the validation remains current.

(26) ST2. Security Threat Group-II. Documentation establishes that the inmate's STG-II designation may require special attention or placement consideration, while the validation remains current.

(27) TIM. Inmate's time to serve is long, requiring placement at a facility with a security level higher than that which is consistent with his/her placement score.

(28) VIO. Inmate has a current or prior conviction for a violent felony, or a sustained juvenile adjudication including, but not limited to, those listed under Penal Code section 667.5(c), a felony conviction or equivalent finding for Penal Code section 192(b), a felony or misdemeanor conviction or equivalent finding for Penal Code section 422 or 646.9, or a guilty finding for Division A-1 or A-2 RVR offense that is the equivalent of a Penal Code section 667.5(c) offense which occurred on or after February 20, 2017, which, as determined by the CSR, requires placement in a facility with a higher security level than that indicated by his/her placement score. For the purpose of this subsection, an equivalent finding means any finding specified within subsections 3375.2(b)(28)(A) through 3375.2(b)(28)(C). For the purpose of this subsection, a case-by-case review for VIO means a classification committee action in which the committee conducting the review examines the totality of the inmate's case factors including, but not limited to: the circumstances of the offense, extent of injury to the victim(s), rationale for committing the offense, criminal intent versus neglect, history of committing similar acts, and the safety of the public, staff, and other inmates.

220

# TITLE 15

HISTORY:

1. New section filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 12-20-91 order including amendment of subsection (d)(1) transmitted to OAL 4-20-92 and filed 6-2-92 (Register 92, No. 24).
3. New subsection (h) and amendment of Note filed 12-10-2002; operative 1-9-2002 (Register 2002, No. 50).
4. Change without regulatory effect amending subsection (b)(4) filed 3-11-2013 pursuant to section 100, title 1, California Code of Regulations (Register 2013, No. 11).
5. Amendment of section heading, repealer and new section and amendment of Note filed 12-29-2017 as an emergency; operative 1-1-2018 (Register 2017, No. 52). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-11-2018 or emergency language will be repealed by operation of law on the following day.
6. Amendment of section heading, repealer and new section and amendment of Note refiled 6-7-2018 as an emergency pursuant to Penal Code section 5058.3; operative 6-12-2018 (Register 2018, No. 23). Pursuant to Penal Code section 5058.3(a) and Government Code section 11346.1(h), a Certificate of Compliance must be transmitted to OAL by 9-10-2018 or emergency language will be repealed by operation of law on the following day.
7. Certificate of Compliance as to 6-7-2018 order, including amendment of section and further amendment of Note, transmitted to OAL 9-5-2018 and filed 10-17-2018; amendments operative 10-17-2018 pursuant to Government Code section 11343.4(b)(3) (Register 2018, No. 42).

## 3371.2. Credits for Escapee or Parole Violator.

(a) An escapee or parole violator shall receive credit on their sentence for time in another jurisdiction's custody when they are held on "our hold only" and are available for return to the department's custody. No credit shall be applied for the time they are held on "our hold only" and are resisting extradition.

(b) An escapee or parole violator in local confinement is available except when serving a sentence in lieu of a fine or a sentence expressly ordered to run consecutively to their existing prison term.

(c) An escapee or parole violator in local confinement is available on the date our hold was placed or, if declared at-large and parole was suspended, the date of their arrest.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 2900 and 5054, Penal Code.

HISTORY:

1. New section filed 12-20-91 as an emergency; operative 12-20-91 (Register 92, No. 4). A Certificate of Compliance must be transmitted to OAL 4-20-92 or emergency language will be repealed by operation of law on the following day.
2. Certificate of Compliance as to 12-20-91 order transmitted to OAL 4-20-92 and filed 6-2-92 (Register 92, No. 24).

## Article 10.   Classification

## 3375. Classification Process.

(a) The classification process shall be uniformly applied, commencing upon reception of a person committed to the custody of the Secretary and shall continue throughout the time the individual remains under the Secretary's jurisdiction. Each inmate shall be individually classified in accordance with this article. Senate Bill 618 Participants, as defined in section 3000 and pursuant to subsection 3077.1(a)(1)(C), shall receive a preliminary classification at a county facility prior to reception at a departmental institution.

(b) The classification process shall take into consideration the inmate's needs, interests and desires, his/her behavior and placement score in keeping with the Department and institution's/facility's program and security missions and public safety.

(1) An automated needs assessment tool that identifies an inmate's criminogenic needs shall be administered pursuant to Section 3375.6.

(c) Each determination affecting an inmate's placement within an institution/facility, transfer between facilities, program participation, privilege groups, or custody designation shall be made by a classification committee composed of staff knowledgeable in the classification process.

(d) The classification of felon inmates shall include the classification score system as established. A lower placement score indicates lesser security control needs and a higher placement score indicates greater security control needs.

(e) When possible, the inmate shall be given sufficient advance written notice of any classification committee hearing to provide the inmate reasonable preparation time to discuss the matter to be considered. An inmate appearing before a classification committee shall be informed of the inmate's next classification committee hearing date when it is known or can be anticipated.

(f) The classification of inmates shall provide the following procedural safeguards:

(1) Inmates shall be given written notice at least 72 hours in advance of a hearing which could result in an adverse effect. Adverse effect is defined as:

(A) Involuntary transfer to a higher security level institution/facility, which is not consistent with the inmate's placement score.
(B) Increase in the inmate's custody designation.
(C) Involuntary placement in segregated housing.
(D) Involuntary removal from an assigned program.
(E) Placement in a reduced work group.
(F) Involuntary transfer to another institution/facility because of the inmate's misbehavior or receipt of new information that may affect staff, inmates, the public, or the safety and security of the institution/facility, whether or not his/her placement score is consistent with the receiving institution's/facility's security level.
(G) Transfer of an inmate to a more restrictive institution or program where the security level is higher.

(2) Except as provided in subsection 3375(f)(3), the inmate shall be present at all initial classification committee hearings and at any other classification committee hearing which could result in an adverse effect upon the inmate.

(3) An in absentia (without inmate's presence) classification hearings may be held only when:

(A) The inmate refuses to appear before the committee.
(B) The inmate is physically incapable of appearing before the committee, or is determined by a psychiatrist to be mentally incompetent and cannot understand the purpose of the hearing.
(C) The purpose of the hearing is to:
1. Improve the inmate's conditions of confinement by reducing or removing a previously imposed restriction.
2. Approve an action requested in writing by the inmate.
3. Determine the need for scheduling, or to schedule, a future classification committee action.

(4) If the inmate was not previously notified and during the classification committee hearing an unanticipated adverse effect emerges, the hearing shall be postponed for at least 72 hours and the inmate shall be referred to the inmate's counselor for assistance when the inmate is illiterate, or the issues are complex unless:

(A) The hearing cannot be postponed because of safety or security factors.
(B) The inmate waives the 72-hour postponement.

(5) The inmate shall be permitted to contest the preliminary score or placement score in the hearing.

(6) Each inmate appearing before a classification committee shall be:

**Secure Perimeter** means the largest Security Perimeter that physically retains inmates in custody on facility property.

**Security Concern** means the inmate does not otherwise meet the Close Custody case factor criteria established in section 3377.2(b); however, based upon an Institution Classification Committee (ICC) review of all available case factors and disciplinary history, the inmate demonstrates an ongoing heightened security risk that potentially threatens institution safety and security and thereby warrants the direct and constant supervision provided by a Close Custody designation.

**Security Module** means any department-approved security desk or security table used to facilitate educational, recreational and/or therapeutic activities for maximum custody inmates and are designed for use with State-issued restraint gear.

**Security Perimeter** means any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being processed through a door, gate, or sallyport.

**Security Threat Group (STG)** means any ongoing formal or informal organization, association, or group of three or more persons which has a common name or identifying sign or symbol whose members and/or associates, individually or collectively, engage or have engaged, on behalf of that organization, association or group, in two or more acts which include, planning, organizing, threatening, financing, soliciting or committing unlawful acts, or acts of misconduct.

**Security Threat Group I (STG-I)** is a term used to identify and prioritize the level of threat the group presents that affects the safety and security of the institution and public safety. STG-I designation will be reserved for STGs that pose the greatest of these threats. STG-I designation will include, but may not be limited to, traditional prison gangs or similar disruptive groups or gangs that the department has certified to have a history and propensity for violence and/or influence over subservient STGs.

**Security Threat Group II (STG-II)** is a term used to identify and prioritize the level of threat the group presents that affects the safety and the security of the institution and public safety. The STG-II designation may include, but is not limited to, traditional disruptive groups/street gangs.

**Security Threat Group Administrative Directive** is an administrative order, approved by the Secretary (or designee) of the CDCR, certifying a group's threat to the safety of staff, offenders, and the security of the institution based on a documented history of and future propensity for violence.

**Security Threat Group (STG) Associate** means any offender or any person who, based on documented evidence, is involved periodically or regularly with the members of a STG. STG Associates will be identified through the validation process.

**Security Threat Group (STG) Behavior** is any documented behavior that promotes, furthers, or assists a STG. This includes, but is not limited to conduct of any person that leads to and includes the commission of an unlawful act and/or violation of policy demonstrating a nexus to a STG.

**Security Threat Group (STG) Member** means any offender or any person who, based on documented evidence, has been accepted into membership by a STG. STG Members will be identified through the validation process.

**Security Threat Group (STG) Suspect** means any offender or any person who, based on documented evidence, is involved periodically or regularly with the members or associates of a STG. The STG suspect is tracked by STG investigative staff pending validation. Suspects have attained more than one but less than ten points of validation as described in Section 3378.2(b).

**Security Threat Group (STG) Unit Classification Committee** is a unit classification committee responsible for making the determination of an inmate's validation status, reviewing Dropout status affiliate's new disciplinary behavior to determine nexus to STG, and reviewing information/intelligence regarding inmate-involved incidents occurring outside CDCR jurisdiction to ensure disciplinary processes and/or formal documentation were applied.

**Senate Bill (SB) 618 Participant** means an adult inmate who is deemed eligible and agrees to participate in a SB 618 Program, as defined in section 3000, which includes that prior to reception by the California Department of Corrections and Rehabilitation, the inmate will be assessed and classified at the county in which he or she is adjudged to have committed his or her crime.

**Senate Bill (SB) 618 Program** means a program developed for nonviolent felony offenders pursuant to SB 618 (2005/2006 session), which added Penal Code section 1203.8, which provides in part that programs shall be available for inmates, including Career Technical Education programs and educational programs that are designed to prepare nonviolent felony offenders for successful reintegration back into the community.

**Sending State** means the state that requests the transfer of a cooperative parolee, or that transfers supervision of a cooperative parolee, under the terms of the Interstate Compact for Adult Offender Supervision.

**Sentence Data Sheet** means an option under the Prison function tab within the Strategic Offender Management System that contains commitment and release status of an inmate.

**Serious Bodily Injury (SBI)** means a serious impairment of physical condition, including, but not limited to the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.

**Serious Offense**, for the purpose of conducting parole revocation hearings, refers to any felony listed in section 1192.7(c) of the Penal Code.

**Sexual Activity** means any behavior of a sexual nature between an inmate and a visitor including, but not limited to:

(1) Sexual intercourse, oral copulation, or masturbation.

(2) The rubbing or touching of breast(s), buttock(s) or sexual organ(s) for the purpose of arousing, appealing to, or gratifying lust, passions, or sexual desires.

(3) Exposure of breast(s), buttocks or sexual organ(s) for the purpose of arousing, appealing to, or gratifying lust, passions, or sexual desires.

**Sexual Disorderly Conduct** means every person who touches, without exposing, his or her genitals, buttocks or breasts in a manner that demonstrates it is for the purpose of sexual arousal, gratification, annoyance, or offense, and that any reasonable person would consider this conduct offensive.

**Single Family Dwelling** means a real property improvement, such as a house, apartment, or mobile home that is used or is intended for use as a dwelling for one family.

**Small Business Firm** means a business in which the principal office is located in California and the officers of such business are domiciled in California which is independently owned and operated and which is not dominant in its field of operation. The maximum dollar volume that a small business may generate shall vary from industry to industry to the extent necessary to reflect differing characteristics of such industries.

**Special Assignment** means a departmentally-approved special program, temporary or short-term assignment for departmental convenience, or medical or psychiatric treatment category with exceptional credit-earning provisions.

H-7

EXHIBIT

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC 128 B

**NAME and NUMBER:**    **GONZALEZ**                    **E66196**        **XW-222L**

Inmate GONZALEZ

To Whom It May Concern I am submitting this Laudatory Chrono on behalf of I/M GONZALEZ CDC# E66196, Inmate Gonzalez has been a great worker for Correctional Training facility may it be his current worksite as a Porter in X-wing or when he worked in Central Culinary as a Main Kitchen Worker. While I have been at Correctional Training Facility since 2015 and I've had multiple interactions with Inmate Gonzalez has always been respectful and courteous towards me and all staff members. Mr. Gonzalez has also been through a plethora of groups like Visual and performing arts, CBI, and College that I've seen him attend because of the position I am at in Central Facility as Corridor Officer. Mr. Gonzalez has always have had a Positive demeanor while it be at work, the yard and in his housing unit. I believe Mr. Gonzalez to be in the positive mindset and to be absent of the criminal mindset this place might bring to certain individuals. I think given the chance Mr. Gonzalez will do well in society.

Orig:   C-File
Cc:     Inmate
        Counselor

                                                        A. Gonzalez
                                                    Correctional Officer
                                                            CTF

**Date:** 12/5/23                    **LAUDATORY**                    **GENERAL CHRONO**

I-1

DEPARTMENT OF CORRECTIONS AND REHABILITATION

STATE OF CALIFORNIA

NAME AND NUMBER      GONZALEZ, E.              E66196        **XW301L**              CDCR 128-B

I have supervised, both directly and indirectly, Inmate **GONZALEZ, E66196, XW301L**, in the CTF-Facility C Culinary Department since 08/11/2012. I have observed, interacted with, and come to know Inmate **GONZALEZ** as a hard-working individual who has always completed his assigned tasks diligently. He is always on time and has never complained about any given task. He always displays exceptional behavior and attitude towards supervisory staff as well as his inmate peers. Inmate **GONZALEZ** is to be commended for his behavior and a job well done.

Original: Central File
    cc: Writer-
        Inmate

C. Morris, C/O
Culinary Officer, 3rd Watch, x4810
CTF-Facility C

DATE:    03/21/2023                    LAUDATORY                    GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

CDC-128 B

**NAME and NUMBER**         **GONZALEZ, E.**          **E66196**          **XW-222L**

I am submitting this chrono on behalf of incarcerated person Gonzalez to document my assessment of his behavior and work performance. As a Culinary worker, incarcerated person Gonzalez has consistently exhibited an attitude of professionalism and courtesy in his interactions with peers and staff members. Gonzalez is punctual, dependable, and is always ready to take on additional responsibilities. He is motivated toward self-improvement and his interest in his assignment shows it. He is helpful, cooperative, and always has a good attitude. Incarcerated person Gonzalez should be commended for his work ethic and obvious desire to become a productive member in society.

6/8/25

**D. SISNEROS**
3RD  WATCH CULINARY OFFICER
Correctional Training Facility- Central

Original: Central File
     cc: CC1
          Inmate

**DATE: 6/8/2025**          **LAUDATORY CHRONO**          CTF

I-3

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDCR 128-B

STATE OF CALIFORNIA

NAME AND NUMBER        Gonzalez, E.                    E66196        EW218L

On January 4, 2016, Central Culinary was placed on Modified Program status for ten (10) days for maintenance repair work in the Dining Halls. During the duration of the modified program Inmate Gonzalez, E66196, position number MKW.005.004 worked extended hours, including his regular days off. It should be noted that Inmate Gonzalez worked in all job areas of the Cul'  '', even those where he is not normally assigned nor accustomed to, including the preparation, delivery and retrieval of food to the    ividual wings. Inmate Gonzalez has performed the tasks assigned him to the best of his ability. During this time the Culinary workers were reduced to less that twenty percent (25%) of the inmate work crew from the usual of over one hundred and eighty (180) inmates. All tasks normally performed by a full crew were completed by the reduced crew each day. These assignments were completed with diligence and Inmate Gonzalez needed little or no supervision. During special occasions, such as Christmas, Independence Day, Thanksgiving, and New Year's Day, as well as Special Food Sale days your participation helped carry out the program most effectively. Your actions have been greatly appreciated. Inmate Gonzalez should be commended for all his work, efforts and attitude during this period.

Original: Central File
   cc: Writer
     Inmate

T.T. LAMSON
Culinary Sergeant
CTF-Facility C, Ext. # 4810

DATE:   1/28/16                              LAUDATORY                                    GENERAL CHRONO

Case 3:24-cv-06675-RFL    Document 18-1    Filed 10/02/25    Page 45 of 53

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

CDCR 128-B

NAME AND NUMBER    GONZALEZ, E.                     E66196        XW210L

I am submitting this chrono on behalf of Inmate GONZALEZ, E66196, to document my assessment of his behavior and work performance. Inmate GONZALEZ has been assigned as a COOK APPRENTICE in CTF-Facility "C" Culinary since 4/7/2016, and has been assigned in other Culinary positions since 3/9/2013. I have had extensive observation of him to be a unique and reliable individual. Inmate GONZALEZ has performed his assignment diligently and has shown a great sense of responsibility. Inmate GONZALEZ is an easygoing person, is always on time, courteous, and possesses a strong work ethic. Additionally, Inmate GONZALEZ is professional and respectful with everyone he encounters. Because of these qualities, Inmate GONZALEZ has been well regarded by both staff and inmates. Inmate GONZALEZ is to be commended for a job well done.

Original: Central File
   cc: Writer
     Inmate

G. CAMPBELL, CSC
Correctional Supervising Cook, 3rd Watch
CTF-Facility C

DATE:    10/19/2016                    LAUDATORY                    GENERAL CHRONO

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128 B

**ERIC GONZALEZ**                              E66196

I have come to know Inmate Gonzales E66196 as a hard working individual. The tireless efforts that he has demonstrated while maintaining a positive attitude is nothing short of amazing. Inmate Gonzalez has continuously overcome all negative disruptiveness while demonstrating his ability of successfully maintaining a smooth transitional program against all odds. In the time I have known Inmate Gonzalez, I have had the opportunity to observe his strong work ethic, and he is punctual, courteous, and driven. He completes his assigned duties without complaint and volunteers in areas in which he is not assigned, this is a great help to the daily operation of the Central Culinary Department. Inmate Gonzalez is appreciated by staff and inmates alike, and this Chrono is but a small gesture to acknowledge his rehabilitative efforts.

Original:    Central File
     cc:    CC1
            Inmate

J. ADAMS
Supervising Correctional Cook
Correctional Training Facility- Central

**DATE:**        03/23/2023                      **LAUDATORY CHRONO**    **CTF-Central**

H-6

EXHIBIT "J"

| DATE | TIME |
|------|------|
| 1/12/09 | 1630 |

Psychiatry Appeal evaluation

Patient is a 38 y o AAM who entered CDCR in 1998 ē a sentence of 31 yrs to life. He was born in Atlantic City, NJ + moved to California ē his mother + 2 older brothers. He attended school until the 12 grade + later got a GED. He denies behavioral problems in his youth + had several low wage jobs as a teenager. He was arrested in 1990 at age 20 for rape of a prostitute ē a 12 yr sentence. He paroled in 1996. He married in 1996 + divorced in 2003. He has a 10 y o son from this relationship. He was arrested again in 1997 for attempted kidnap and assault ē a sentence of 31 yrs to life. He is appealing this conviction.

The inmate had no mental health issues prior to age 20. During his first term he lived in a Dorm + had no "papers" + experienced no undue anxiety or panic attacks. On his second incarceration he was in a Dorm in jail + had no problem. On arrival in CDCR he was placed in double cell.

| INSTITUTION | HOUSING UNIT |
|-------------|--------------|
| CTF | |

**INTERDISCIPLINARY PROGRESS NOTES**

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Gonzales, Eric
E-66196
5/4/70

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

CTF Soledad [Eric Gonzalez]

| DATE | TIME | |
|---|---|---|
| 1/12/0 | 9 | **Psychiatry (continued)** |

He was appealing his case + had paperwork indicating the sexual offense. He was very fearful his cell mate would get the papers and he would be threatened. He had his first panic attack, thought he was having a heart attack + was sent to hospital for evaluation. Subsequently he would have milder panic attacks every 2-3 weeks. He continued to think these were physical problems c̄ frequent clinic visits. He was not referred to mental health. He went from Wasco to Corcoran to Soledad (north) in 2002. In 2003 he was reclassified. Paper work was left in his cell + his cell mate saw them. The cell mate confronted him + assaulted him late that evening. The cell mate transferred + the patient was moved to central. Following this episode the panic attacks were more frequent and the patient started having PTSD type symptoms c̄ nightmares, flashbacks, poor sleep, paranoia + withdrawal. He continued feeling he had medical issues + was followed in the medical clinic. In June 2004 a prolonged lock down started + the

INSTITUTION
C T F

HOUSING UNIT

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Gonzales, Eric
E-66196
5/4/70

## INTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

CTF Soledad [Eric Gonzalez]

| DATE | TIME | |
|------|------|--|
| 1/2/09 | | Psychology (Continued) |

Patients symptoms continued + intensified. He was then referred to mental health + has been followed since that time. He requested a single cell which was denied in IDTT 8/1/08. On 8/11/08 he was started on Celexa 20mg + Vistaril 25-50mg by Dr. Wolcott. On 8/25 the vistaril was discontinued and on 9/19 the celexa was increased to 40mg. The patients symptoms continued. The diagnosis at that time was panic disorder c̄ agoraphobia. IDTT on 10/9/09 granted the patient single cell status for 90 days. On 10/16 Dr. Katz also entertained a diagnosis of PTSD. On 10/30/08 the patient noted no panic attacks in 2 weeks since he had been in a single cell. The patient says out of the cell in a dorm setting his anxiety is much better because he can get away + custody officers are more available. Diagnosis by Dr. Katz on 11/26 was panic disorder c̄ agoraphobia and anxiety disorder NOS. On 12/8/09 depressive disorder NOS was added. In December the patient was becoming more anxious because his single cell status was ending.

| INSTITUTION | HOUSING UNIT |
|-------------|--------------|
| CTF | |

**INTERDISCIPLINARY PROGRESS NOTES**

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Gonzales, Eric
E66196
5/4/70

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA     DEPARTMENT OF CORRECTIONS

**CTF Soledad [Eric Gonzalez]**

| DATE | TIME | |
|------|------|--|
| 1/12/09 | | |

Psychiatry (continued)

Dr. Wolcott increased the celexa to 60mg and vistaril was added 25mg HS for sleep. Later the vistaril was increased to 50-100mg HS. IDTT on 12/23 extended the single cell to 3/31/09 ⊂ a plan to treat his anxiety disorder ⊂ exposure therapy + return to double cell. The patient continues to ruminate + be anxious about return to double cell.

Since he has been on single cell the panic attacks are much better. He sleeps better ⊂ the vistaril. He does feel depressed, sleeps alot + has gained weight. He has flash backs + nightmares of the assault. He is hypervigilant. He has problem concentrating. He denies SI or HI. He is fearful if placed ⊂ cellie he will get into a fight. He denies HI but occasionally sees shadows. He is suspicious of "everyone" + worries about attack because of his sexual offense.

Ⓞ Patient is alert + cooperative. He talks easily + tends to perseverate about his fears + anxiety. He declined Cooke that depressed. He denied SI or HI. No obvious hallucinations were noted

INSTITUTION
CTF

HOUSING UNIT

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Gonzales, Eric
E 66196
5/4/70

INTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

CTF Soledad [Eric Gonzalez]

⑤

| DATE | TIME |
|------|------|
| 1/12/09 | |

Psychical continued

Hygiene was good. Cognitive function was good.

Ⓐ Dragon I Panic disorder ⊤ agoraphobia in partial remission

PTSD

Depression disorder NOS

II defer

III Low back pain, asthma, hyperlipidemia Hypertension

IV Prison + sexual offense

V GAF 55

Ⓟ ① Current medications are Celexa 60mg po HS + Vistaril 50-100mg po HS + appear to be helping.

⑤ The patient appears to have significant PTSD + pain attacks that are made worse by double cell situation.

J EMcMahon us
JE Hodgkins

| INSTITUTION | HOUSING UNIT |
|-------------|--------------|
| CTF | |

**INTERDISCIPLINARY PROGRESS NOTES**

CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH

Gonzales, Eric
E66196
5/4/70

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA                    DEPARTMENT OF CORRECTIONS

**CTF Soledad [Eric Gonzalez]**

## PROOF OF SERVICE

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _Eric L. Gonzalez_, declare:

I am over 18 years of age and a party to this action. I am domiciled at the Correctional Training Facility (CTF), a California State Prison, in the county of Monterey. The address at this facility is; P.O. Box 689, Soledad, California 93960

On _09/29_, 20_25_, I served the attached:

_Declaration of Eric Gonzalez in Support of Plaintiff's_

_Opposition to Motion For Summary Judgment_

On the parties herein by placing true and correct copies thereof, enclosed in an envelope, with the postage thereon fully paid, in the United States Postal Mail Box so provided at the above named correctional institution in which I am presently domiciled.
The envelope(s) were addressed as follows:

_Department of Justice_
_ATTN: Isha Vazirani, Deputy A.G._
_455 Golden Gate Ave., Ste. 11000_
_San Francisco, CA 94102-7004_

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at CTF on this date: _09/29_, 20_25_

Signature: _Eric L. Gonzalez_

**Prison Mailbox Rule**

Under the "Prison Mailbox Rule" a prisoner's legal document is deemed filed for statute of limitation purposes when he hands it over to prison authorities for mailing. *Houston v. Lack (1998) 487 U.S. 266, 274; Huizar v. Carey,(9ᵗʰ Cir. 2001)273 F.3d 1220, 1322.* The mailbox rule applies to prisoners in both federal and state courts. *Huizar, 273 F.3d at p. 1223.*